# DICKERSON, DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS v. NEW BANNER INSTITUTE, INC.

No. 81–1180.   Argued November 29, 1982—Decided February 23, 1983

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BRENNAN, STEVENS, and O'CONNOR, JJ., joined, *post*, p. 122.

*Deputy Solicitor General Geller* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Samuel A. Alito, Jr., William Kanter,* and *Douglas Letter.*

*Lewis C. Lanier* argued the cause for respondent. With him on the brief was *Jack R. McGuinn.** 

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether firearms disabilities imposed by 18 U. S. C. §§ 922(g) and (h) apply with respect to a person who pleads guilty to a state offense punishable by imprisonment for more than one year, when the record of the proceeding subsequently is expunged under state procedure following a successfully served term of probation.

I

Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 226, was amended by the Gun Control Act of 1968, 82 Stat. 1214, and now appears as 18 U. S. C. § 921 *et seq.* (1976 ed. and Supp. V). Title IV makes it unlawful for any person "who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year"[1] to ship, transport, or receive any firearm or ammunition in interstate commerce. §§ 922(g) and (h). Title IV also makes it unlawful to engage in the business of importing, manufacturing, or dealing in firearms without a license from the Secretary of the Treasury. §§ 922(a) and 923(a). One ground, specified by the statute, for denial of a license is the fact that the applicant is barred by §§ 922(g) and (h) from transporting, shipping, or receiving firearms or ammunition. § 923(d)(1)(B). The same statute provides that where the applicant is a corporation, partnership, or association, a license will be denied

---

*David T. Hardy* and *Richard E. Gardiner* filed a brief for the National Rifle Association of America as *amicus curiae* urging affirmance.

[1] The Act provides exemptions from its proscriptions for certain business and commercial crimes, such as antitrust violations, punishable by imprisonment for more than one year, and for nonfirearms and nonexplosives state offenses classified by the State as misdemeanors and punishable by imprisonment for two years or less. 18 U. S. C. § 921(a)(20). These exemptions are of no relevance here.

if an individual possessing, directly or indirectly, the power to direct the management and policies of the entity is under the prohibitions imposed by §§ 922(g) and (h). Title IV also makes it a crime to violate any of its provisions or to make a willful misrepresentation with respect to information required to be furnished. § 924(a).

Although, as noted above, Title IV imposes disabilities upon any "person who has been convicted . . . of a crime punishable by imprisonment for a term exceeding one year," it does permit certain persons in that category to apply to the Secretary for relief from those disabilities. Under § 925(c), the Secretary may grant relief "if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." When the Secretary grants relief, he must publish notice of his action promptly in the Federal Register, together with a statement of reasons. *Ibid.*

## II

David F. Kennison, a resident of Columbia, S. C., is a director, chairman of the board, and a shareholder of respondent New Banner Institute, Inc., a corporation. In September 1974, when Kennison was in Iowa, he was arrested and charged with kidnaping his estranged wife. After plea negotiation, see Tr. of Oral Arg. 40–41, he pleaded guilty to the state crime of carrying a concealed handgun, and the kidnaping charge was dismissed. The concealed weapon offense, under then Iowa law, see Iowa Code §§ 695.2 and .3 (1977), was punishable by a fine of not more than $1,000 or by imprisonment for not more than five years, or both.[2] In ac-

---

[2] The court, however, in its discretion, in the case of a first offense, could reduce that punishment. See Iowa Code § 695.3 (1977). Sections 695.2 and .3 were repealed effective January 1, 1978, and are now replaced by Iowa Code §§ 724.4 and 903.1 (1981).

cord with the provisions of Iowa Code § 789A.1 (1977), then in effect,[3] the state court entered an order reciting that Kennison had "entered a plea of guilty to the charge of carrying a concealed weapon," that "the defendant has consented to a deferment of sentence in this matter," that "he has stable employment," and that there were "unusual circum-

---

[3] Section 789A.1 then read in pertinent part:

"The trial court may, upon a plea of guilty, verdict of guilty, or a special verdict upon which a judgment of conviction may be rendered, exercise either of the options contained in subsections 1 and 2. However, this section shall not apply to the crimes of treason, murder, or violation of [other specified statutes].

"1. With the consent of the defendant, the court may defer judgment and place the defendant on probation upon such terms and conditions as it may require. Upon fulfillment of the terms of probation the defendant shall be discharged without entry of judgment. Upon violation of the terms, the court may enter an adjudication of guilt and proceed as otherwise provided.

"However, this subsection shall not be available if any of the following is true:

"[Here are recited specific exceptions to the availability of the procedure outlined in subsection 1.]

"2. By record entry at time of or after sentencing, the court may suspend the sentence and place the defendant on probation upon such terms and conditions as it may require.

"Before exercising either of the options contained in subsections 1 and 2, the court shall first determine which of them will provide maximum opportunity for the rehabilitation of the defendant and protection of the community from further offenses by the defendant and others. In making this determination the court shall consider the age of the defendant, his prior record of convictions, if any, his employment circumstances, his family circumstances, the nature of the offense committed, whether a dangerous weapon or force was used in the commission of such offense, and such other factors as shall be appropriate. The court shall file a specific written statement of its reasons for and the facts supporting its decision to defer judgment or to suspend sentence and its decision on the length of probation."

Section 789A.1 was enacted by 1973 Iowa Acts, ch. 295, § 1. It was repealed by 1976 Iowa Acts, ch. 1245, § 526, effective January 1, 1978. The current replacement statutes are Iowa Code §§ 907.3, .4, and .5 (1981).

stances" in the case. The order then stated that the court "deferred" entry of a formal judgment and placed Kennison on probation.

Kennison returned to South Carolina where he completed his probation term. When that term expired in February 1976, he was discharged pursuant to Iowa Code § 789A.6 (1977), then in effect,[4] and the Iowa court's record with reference to the deferred judgment was expunged.

In May 1976, respondent filed three applications with the Treasury Department's Bureau of Alcohol, Tobacco and Firearms (Bureau), for licenses as a dealer in firearms and ammunition, as a manufacturer of ammunition, and as a collector of curios and relics. On the application forms, respondent listed Kennison as a "responsible person," that is, an individual possessing direct or indirect power to control the management and policies of respondent. See 18 U. S. C. § 923(d)(1)(B). In answering an inquiry on the forms as to whether such person had been convicted of a crime punishable by a prison term exceeding one year, respondent did not disclose the Iowa events or Kennison's plea of guilty in that State. The requested licenses were issued.

The Bureau, however, subsequently learned of the Iowa concealed weapon charge and the plea of guilty. In conformity with the provisions of §§ 923(e) and (f)(1) and of 27 CFR

---

[4] Section 789A.6 then read in pertinent part:

"At any time that the court determines that the purposes of probation have been fulfilled, the court may order the discharge of any person from probation. . . . A person who has been discharged from probation shall no longer be held to answer for his offense. Upon discharge from probation, if judgment has been deferred under section 789A.1, the court's criminal record with reference to the deferred judgment shall be expunged. The record maintained by the supreme court administrator required by section 789A.1 shall not be expunged. . . ."

Section 789A.6 was also enacted in 1973 and was repealed, effective January 1, 1978, by the same Iowa statutes cited in the last paragraph of n. 3, *supra*. The current statute replacing § 789A.6 is Iowa Code § 907.9 (1981).

§ 178.75 (1982), it mailed respondent Notices of Contemplated Revocation of Licenses. After an informal hearing, the Bureau's Regional Regulatory Administrator issued the revocation notices. Respondent, pursuant to § 923(f)(2), then requested and received a formal hearing before an Administrative Law Judge. At that hearing, the Bureau contended that respondent's licenses should be revoked because respondent had failed to reveal that Kennison had been convicted of a felony and also because respondent had not been entitled to the licenses in the first place.

The Administrative Law Judge recommended against revocation. App to Pet. for Cert. 41a. Although he concluded that Kennison's plea of guilty "represented a conviction . . . within the meaning of Section 922(g) and (h)," *id.*, at 47a, he also concluded that respondent's statements in the applications did not justify revocation because its representatives had a good-faith belief that Kennison had not been convicted within the meaning of the federal statute.

On review, the Director of the Bureau, petitioner here, ruled that willful misrepresentation had not been shown; that Kennison, however, possessed the power to direct respondent's management and policies; that Kennison had been convicted in Iowa of an offense that brought him within the prohibitions of §§ 922(g) and (h); and that the licenses should be revoked because respondent was ineligible for them under § 923(d)(1)(B). App. to Pet. for Cert. 23a. The Director ordered the issuance of Final Notices of Revocation. *Id.*, at 40a.

Respondent then filed a timely petition for review in the United States District Court for the District of South Carolina. See § 923(f)(3). On cross-motions for summary judgment, the Director's motion was granted. On respondent's appeal, however, the United States Court of Appeals for the Fourth Circuit reversed. 649 F. 2d 216 (1981). It concluded, *id.*, at 219, that although Kennison indeed had been "convicted" of an offense that triggered firearms disabilities,

that fact could not serve as a predicate for a Gun Control Act violation or license revocation because the conviction had been expunged under the Iowa deferred judgment procedure. The court acknowledged, *id.*, at 220, that other Courts of Appeals entertained contrary views.[5] Because of the importance of the issue and the obvious need for its resolution, we granted certiorari. 455 U. S. 1015 (1982).

## III

This is not the first time the Court has examined firearms provisions of the Omnibus Crime Control and Safe Streets Act and of the Gun Control Act. See *Lewis* v. *United States*, 445 U. S. 55 (1980); *Scarborough* v. *United States*, 431 U. S. 563 (1977); *Barrett* v. *United States*, 423 U. S. 212 (1976); *Huddleston* v. *United States*, 415 U. S. 814 (1974); *United States* v. *Bass*, 404 U. S. 336 (1971).

Despite the fact that the slate on which we write is thus not a clean one, we state once again the obvious when we note that, in determining the scope of a statute, one is to look first at its language. *Lewis* v. *United States*, 445 U. S., at 60; *United States* v. *Turkette*, 452 U. S. 576, 580 (1981). If the language is unambiguous, ordinarily it is to be regarded as conclusive unless there is "'a clearly expressed legislative intent to the contrary.'" *Ibid.*, quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). It would seem, therefore, from the clear words of the statute ("any person . . . who has been convicted"), that, for respondent to be deprived of its licenses, Kennison must have been "convicted" of the type of crime specified by the statute, and the Iowa deferred judgment procedure and "ex-

---

[5] See *United States* v. *Bergeman*, 592 F. 2d 533 (CA9 1979); *United States* v. *Mostad*, 485 F. 2d 199 (CA8 1973), cert. denied, 415 U. S. 947 (1974); *United States* v. *Lehmann*, 613 F. 2d 130 (CA5 1980). See also, *e. g.*, *United States* v. *Padia*, 584 F. 2d 85 (CA5 1978); *United States* v. *Gray*, 692 F. 2d 352 (CA5 1982); *United States* v. *Nord*, 586 F. 2d 1288 (CA8 1978); *United States* v. *Kelly*, 519 F. 2d 794 (CA8), cert. denied, 423 U. S. 926 (1975).

punction" must not have operated to nullify that conviction. If Kennison was not "convicted" in the first place, or if he was and that conviction somehow was rendered a nullity, respondent should not be ineligible for licenses on the grounds asserted by the Bureau.

A

We turn first to the issue of conviction. The salient fact is Kennison's plea of guilty to a state charge punishable by more than a year's imprisonment. The usual entry of a formal judgment upon a jury verdict or upon a court's specific finding of guilt after a bench trial is absent. Present, however, are (a) the charge of a crime of the disqualifying type, (b) the plea of guilty to that charge, and (c) the court's placing Kennison upon probation.

In *Lewis* v. *United States, supra,* we had under consideration § 1202(a)(1) of Title VII of the 1968 Act, 18 U. S. C. App. § 1202(a)(1), a gun control statute similar to and partially overlapping §§ 922(g) and (h). The language of § 1202 (a)(1) that is pertinent for present purposes is familiar, for it concerns any person who "has been convicted . . . of a felony." The Court there characterized the language of the statute as "sweeping." 445 U. S., at 60. Despite the fact that Lewis' conviction was subject to collateral attack on constitutional grounds, the Court held that conviction to be disabling. What was important to the Court was the presence or fact of the conviction. In speaking of Title VII, we said: "No modifier is present, and nothing suggests any restriction on the scope of the term 'convicted.'" *Ibid.* Still further: "'Nothing on the face of the statute suggests a congressional intent to limit its coverage . . . .'" *Ibid.*, quoting *United States* v. *Culbert,* 435 U. S. 371, 373 (1978). And, finally: "Actually, . . . we detect little significant difference between Title IV and Title VII." 445 U. S., at 64.

Whether one has been "convicted" within the language of the gun control statutes is necessarily, as the Court of Appeals in the present case correctly recognized, 649 F. 2d, at

219, a question of federal, not state, law, despite the fact that the predicate offense and its punishment are defined by the law of the State. *United States* v. *Benson*, 605 F. 2d 1093, 1094 (CA9 1979). This makes for desirable national uniformity unaffected by varying state laws, procedures, and definitions of "conviction."

In *Lewis*, the possible, and indeed probable, vulnerability of the predicate conviction to collateral attack on constitutional grounds did not affect the disqualification. This followed from the statute's plain language and from a legislative history that, as we have repeatedly observed, makes clear that "'Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that "they may not be trusted to possess a firearm without becoming a threat to society."'" 445 U. S., at 63, quoting *Scarborough* v. *United States*, 431 U. S., at 572. Like considerations apply here with respect to whether Kennison was one who was "convicted" within the meaning of the federal statute.[6] He voluntarily, in negotiation, entered a plea of guilty to a disqualifying crime. In some circumstances, we have considered a guilty plea alone enough to constitute a "conviction": "A plea of guilty differs in purpose and effect from a mere

---

[6] To be sure, the terms "convicted" or "conviction" do not have the same meaning in every federal statute. In some statutes those terms specifically are made to apply to one whose guilty plea has been accepted whether or not a final judgment has been entered. See, *e. g.*, 15 U. S. C. §§ 80a–2(10) and 80b–2(6). In other federal statutes, however, the term "convicted" is clearly limited to persons against whom a formal judgment has been entered. See, *e. g.*, 18 U. S. C. § 4251(e) and 28 U. S. C. § 2901(f).

The term "convicted" in §§ 922(g) and (h) is not there defined, but we have no reason whatsoever to suppose that Congress meant that term to apply only to one against whom a formal judgment has been entered. Congress' intent in enacting §§ 922(g) and (h) and § 1202 was to keep firearms out of the hands of presumptively risky people. See *United States* v. *Bass*, 404 U. S. 336, 345 (1971). In this connection, it is significant that §§ 922(g) and (h) apply not only to a person convicted of a disqualifying offense but also to one who is merely under indictment for such a crime.

admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." *Kercheval* v. *United States,* 274 U. S. 220, 223 (1927). Accord, *Boykin* v. *Alabama,* 395 U. S. 238, 242 (1969).[7]

Here, we do have more. The state judge who noted Kennison's plea placed him on probation. To be sure, there was no written adjudication of guilt and there was no formal pronouncement of a sentence of imprisonment for a specified term. But that was due to special provisions of Iowa statutory law and procedure. It was plainly irrelevant to Congress whether the individual in question actually receives a prison term; the statute imposes disabilities on one convicted of "a crime *punishable* by imprisonment for a term exceeding one year." § 922(g) (emphasis supplied). It is also plain that one cannot be placed on probation if the court does not

---

[7] As noted in n. 6, *supra,* the meaning of the terms "convicted" and "conviction" vary from statute to statute. In *Lott* v. *United States,* 367 U. S. 421 (1961), for example, the Court had under consideration Federal Rule of Criminal Procedure 34 and a plea of *nolo contendere,* rather than a plea of guilty. The question was whether the time within which certain motions could be made began to run at the time the *nolo* plea was entered or at the time judgment was pronounced and sentence imposed. The Court spoke of the possibility of the plea's being withdrawn before sentence was imposed and therefore said that "it is the judgment of the court—not the plea—that constitutes the 'determination of guilt.'" *Id.,* at 427. In construing Rule 34, of course, the Court had before it no evidence of a congressional intent to rule broadly to protect the public comparable to that animating Title IV. Moreover, in *Lott* the Court did not deal with the situation where probation is imposed on the basis of the plea. Under the Iowa expunction statute, one who has pleaded guilty is treated identically to one who has been found guilty by a jury. See n. 3, *supra.* There is no suggestion in the Iowa statutes, and respondent has not suggested, that once the plea was noted and probation imposed Kennison could withdraw his plea. Indeed, it was a negotiated plea accompanied by the dismissal of the kidnaping charge.

deem him to be guilty of a crime[8]—in this case a crime that Congress considered demonstrative of unreliability with firearms. Thus, for purposes of the federal gun control laws, we equate a plea of guilty and its notation by the state court, followed by a sentence of probation, with being "convicted" within the language of §§ 922(g) and (h). See *United States* v. *Woods*, 696 F. 2d 566, 570 (CA8 1982) ("once guilt has been established whether by plea or by verdict and nothing remains to be done except pass sentence, the defendant has been convicted within the intendment of Congress").

## B

That, however, is not an end to the matter. We still must determine whether Iowa's expunction provisions, as carried out in Kennison's case prior to respondent's license applications, nullified his conviction for purposes of the federal statute.[9]

We recognized in *Lewis* that a qualifying pardon, see 27 CFR § 178.142 (1982), or a consent from the Secretary of the Treasury would operate to relieve the disability. 445 U. S., at 60–61.[10] So far as the face of the statute is concerned,

---

[8] Counsel acknowledged that during the period of Kennison's probation, respondent was disqualified for a license. Tr. of Oral Arg. 36–37.

[9] For purposes of Iowa's own gun control statute, Iowa Code § 724.26 (1981), it might be argued that the conviction was nullified. See *State* v. *Walton*, 311 N. W. 2d 110, 112 (Iowa 1981). Nevertheless, the Supreme Court of Iowa has observed that the "word 'conviction' is of equivocal meaning, and its use in a statute presents a question of legislative intent." *State* v. *Hanna*, 179 N. W. 2d 503, 507 (1970). Presumably, therefore, if the Supreme Court of Iowa were called upon to construe the term "convicted" in a statute like §§ 922(g) and (h), that court would look to "legislative intent."

In any event, Iowa's law is not federal law, and it does not control our decision here. We therefore look to federal considerations in resolving the present case.

[10] Title VII, which we construed in *Lewis*, explicitly provides that pardons granted by the President of the United States or a state governor, specifying that the recipient is authorized to receive, possess, or transport firearms, lift the disabilities imposed by that Title. 18 U. S. C. App.

however, expunction under state law does not alter the historical fact of the conviction, and does not open the way to a license despite the conviction, as does positive or "affirmative action," *ibid.*, by way of the Secretary's consent on the conditions specified by § 925(c). In *Lewis*, it is true, we recognized an obvious exception to the literal language of the statute for one whose predicate conviction had been vacated or reversed on direct appeal. 445 U. S., at 61, n. 5; see Note, Prior Convictions and the Gun Control Act of 1968, 76 Colum. L. Rev. 326, 334, n. 42 (1976). But, in contrast, expunction does not alter the legality of the previous conviction and does not signify that the defendant was innocent of the crime to which he pleaded guilty. Expunction in Iowa means no more than that the State has provided a means for the trial court not to accord a conviction certain continuing effects under state law. Clearly, firearms disabilities may be attached constitutionally to an expunged conviction, see *Lewis* v. *United States*, 445 U. S., at 65–68, and an exception for such a conviction, unlike one reversed or vacated due to trial error, is far from obvious. In *Lewis* we held that the exception for convictions reversed or vacated on direct appeal did not make ambiguous the statute's clear application to convictions arguably vulnerable to collateral attack. We perceive no more ambiguity in the statute here than we did in *Lewis*.

## IV

Other provisions of the federal gun control laws and related federal statutes fortify our conclusion that expunction of a state conviction was not intended by Congress automatically to remove the federal firearms disability.

1. Even conviction is not necessary for disqualification. The mere existence of an outstanding indictment is sufficient

---

§ 1203(2). Except § 925(c), permitting the Secretary to remove the disabilities in specified circumstances, there is no comparable provision in Title IV. By regulation, the Secretary has given Presidential pardons, but not gubernatorial pardons, automatic enabling effect under Title IV. 27 CFR § 178.142 (1982).

under §§ 922(g) and (h). Congress was reaching far and was doing so intentionally.

2. Sections 922(g) and (h) impose the same disabilities upon a person who "*is* under indictment" for certain crimes, or who "*is* a fugitive from justice," or who "*is*" a drug addict or an unlawful user of certain drugs, or who "*has been* convicted in any court" of certain crimes, or who "*has been* adjudicated as a mental defective," or who "*has been* committed to a mental institution" (emphasis supplied). This use of the respective tenses is significant and demonstrates that Congress carefully distinguished between present status and a past event. We have noted this distinction in tenses in § 922, and its significance, before:

> "Congress knew the significance and meaning of the language it employed. It used the present perfect tense elsewhere in the same section . . . , in contrast to its use of the present tense ('who is') in §§ 922(h)(1), (2), and (3). The statute's pattern is consistent and no unintended misuse of language or of tense is apparent." *Barrett* v. *United States*, 423 U. S., at 217.

And in *Scarborough* v. *United States*, 431 U. S., at 570, we observed: "It is obvious that the tenses used throughout Title IV were chosen with care."

3. The imposition, by §§ 922(g)(4) and (h)(4), of continuing disability on a person who "has been" adjudicated a mental defective or committed to a mental institution is particularly instructive. A person adjudicated as a mental defective may later be adjudged competent, and a person committed to a mental institution later may be deemed cured and released. Yet Congress made no exception for subsequent curative events. The past adjudication or commitment disqualifies. Congress obviously felt that such a person, though unfortunate, was too much of a risk to be allowed firearms privileges. See *United States* v. *Bass*, 404 U. S., at 344–345. In the face of this fact, we cannot believe that Congress in-

tended to have a person convicted of a firearms felony under state law become eligible for firearms automatically because of a state expunction for whatever reason.

4. Section 925(c) empowers the Secretary to grant relief from these disabilities in certain cases. The Secretary may not grant such relief, however, to one convicted of a crime involving the use of a firearm or of a federal firearms offense, and may not grant relief in any event unless specific conditions are met to his satisfaction. Again, it is highly unlikely that Congress intended to permit its own circumscription of the ability of the Secretary to grant relief to be overcome by the vagaries of state law. That would be too easy a route to follow in order to circumvent the federal statute. See S. Rep. No. 666, 89th Cong., 1st Sess., 2 (1965).

5. Provisions of Title VII, enacted simultaneously with Title IV, are helpful to our analysis. We have treated Titles VII and IV as *in pari materia* in construing statutory language identical to that at issue here. *Lewis* v. *United States*, 445 U. S., at 61–62. Title 18 U. S. C. App. § 1203(2) exempts from Title VII "any person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm." Thus, in that statute, even a pardon is not sufficient to remove the firearms disabilities unless there is express authorization to have the firearm. It is inconceivable that Congress could have so provided and yet have intended, as the Court of Appeals concluded, 649 F. 2d, at 220–221, to give a state expunction a contrary and unconditional effect. After all, expunction devices were not unknown or unusual when Title IV came into being in 1968. See Comment, Expungement in California: Legislative Neglect and Judicial Abuse of the Statutory Mitigation of Felony Convictions, 12 U. San Fran. L. Rev. 155, 161 (1977); 1909 Cal. Stats., ch. 232, § 1. And the Federal

Youth Corrections Act, in which Congress itself provided for expunction in certain circumstances, see 18 U. S. C. § 5021, was enacted as far back as 1950.   See 64 Stat. 1089.

6.  Title 21 U. S. C. § 844(b) is a federal expunction statute providing that a first offender found guilty of simple possession of a controlled substance may be placed on probation without entry of judgment, and that, upon successful completion of the probation, the court shall discharge the defendant and dismiss the proceeding against him.   But Congress also specifically provided in § 844(b)(1) that such discharge or dismissal "shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime . . . or for any other purpose."   This provision would be superfluous if Congress had believed that expunction automatically removes the disqualification.   Congress obviously knew the plain meaning of the terms it employed in statutes of this kind, and when it wished to create an exception for an expunged conviction, it did so expressly.

## V

"As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve."   *Chapman* v. *Houston Welfare Rights Organization,* 441 U. S. 600, 608 (1979).   In our previous cases we have recognized and given weight to the Act's broad prophylactic purpose:

> "When Congress enacted [18 U. S. C. § 921 *et seq.*] it was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest. . . . The principal purpose of federal gun control legislation, therefore, was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"

*Huddleston* v. *United States*, 415 U. S., at 824, quoting
S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968).

See also *Barrett* v. *United States*, 423 U. S., at 220–221.

In order to accomplish this goal, Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them. Such persons are also barred from obtaining licenses to deal in firearms or ammunition. This latter provision is particularly important because Title IV and federal gun laws generally funnel access to firearms almost exclusively through dealers. See *Huddleston* v. *United States*, 415 U. S., at 825. "The principal agent of federal enforcement is the dealer." *Id.*, at 824.

Although we have searched diligently, we have found nothing in the legislative history of Title IV or related federal firearms statutes that suggests, even remotely, that a state expunction was intended automatically to remove the disabilities imposed by §§ 922(g)(1) and (h)(1). See, *e. g.*, S. Rep. No. 1501, 90th Cong., 2d Sess. (1968); S. Rep. No. 1097, 90th Cong., 2d Sess. (1968); H. R. Rep. No. 1577, 90th Cong., 2d Sess. (1968); H. R. Conf. Rep. No. 1956, 90th Cong., 2d Sess. (1968); H. R. Rep. No. 488, 90th Cong., 1st Sess. (1967). This lack of evidence is significant for several reasons. First, the purpose of the statute would be frustrated by a ruling that gave effect to state expunctions; a state expunction typically does not focus upon the question with which Title IV is concerned, namely, whether the convicted person is fit to engage in the firearms business or to possess a firearm. Second, " '[i]n the absence of a plain indication to the contrary, . . . it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law.' " *NLRB* v. *Natural Gas Utility Dist.*, 402 U. S. 600, 603 (1971), quoting *NLRB* v. *Randolph Electric Membership Corp.*, 343 F. 2d 60, 62–63 (CA4 1965). This is because the application of federal legislation is nationwide and

at times the federal program would be impaired if state law were to control. *Jerome* v. *United States*, 318 U. S. 101, 104 (1943). The legislative history reveals that Congress believed a uniform national program was necessary to assist in curbing the illegal use of firearms. See S. Rep. No. 1097, 90th Cong., 2d Sess., 28, 76–77 (1968). Third, Title IV "is a carefully constructed package of gun control legislation. . . . 'Congress knew the significance and meaning of the language it employed.'" *Scarborough* v. *United States*, 431 U. S., at 570, quoting *Barrett* v. *United States*, 423 U. S., at 217. And Congress carefully crafted a procedure for removing those disabilities in appropriate cases. § 925(c).

Congress, of course, did use state convictions to trigger Title IV's disabilities in the first instance. This, however, was not because Congress wanted to tie those disabilities to the intricacies of state law, but because such convictions provide a convenient, although somewhat inexact, way of identifying "especially risky people." *United States* v. *Bass*, 404 U. S., at 345. There is no inconsistency in the refusal of Congress to be bound by postconviction state actions, such as expunctions, that vary widely from State to State and that provide less than positive assurance that the person in question no longer poses an unacceptable risk of dangerousness. Any potential harshness of the federal rule is alleviated by the power given the Secretary to grant relief where relief is appropriate based on uniform federal standards.

The facts of the present case are illustrative. Because Kennison had "stable employment" at home in South Carolina and no previous conviction, he was placed on probation and allowed to go home. App. to Pet. for Cert. 45a–46a. Although he had no previous conviction, Kennison did have prior arrests for "assault and battery of a high and aggravated nature" and for "child abuse." Record, Govt. Exh. 13. According to him, his supervision during probation consisted of "occasionally report[ing] that [he] had not been arrested." App. to Brief in Opposition 157a. In short, the circum-

stances surrounding the expunction of his conviction provide little, if any, assurance that Kennison is a person who can be trusted with a dangerous weapon.

## VI

Finally, a rule that would give effect to expunctions under varying state statutes would seriously hamper effective enforcement of Title IV. Over half the States have enacted one or more statutes that may be classified as expunction provisions that attempt to conceal prior convictions or to remove some of their collateral or residual effects. These statutes differ, however, in almost every particular. Some are applicable only to young offenders, e. g., Mich. Comp. Laws §§ 780.621 and .622 (1982). Some are available only to persons convicted of certain offenses, e. g., N. J. Stat. Ann. § 2C:52–2(b) (West 1982); others, however, permit expunction of a conviction for any crime including murder, e. g., Mass. Gen. Laws Ann., ch. 276, § 100A (West Supp. 1982– 1983). Some are confined to first offenders, e. g., Okla. Stat., Tit. 22, § 991c (Supp. 1982–1983). Some are discretionary, e. g., Minn. Stat. § 638.02(2) (Supp. 1982), while others provide for automatic expunction under certain circumstances, e. g., Ariz. Rev. Stat. Ann. § 13–912 (1978). The statutes vary in the language employed to describe what they do. Some speak of expunging the conviction, others of "sealing" the file or of causing the dismissal of the charge. The statutes also differ in their actual effect. Some are absolute; others are limited. Only a minority address questions such as whether the expunged conviction may be considered in sentencing for a subsequent offense or in setting bail on a later charge, or whether the expunged conviction may be used for impeachment purposes, or whether the convict may deny the fact of his conviction. Some statutes, too, clearly were not meant to prevent use of the conviction in a subsequent prosecution. See, e. g., Ariz. Rev. Stat. § 13–907 (1978); *United States* v. *Herrell,* 588 F. 2d 711 (CA9

1978), cert. denied, 440 U. S. 964 (1979). These and other differences provide nothing less than a national patchwork.

In this case, for example, although the Court of Appeals referred to Iowa's deferred judgment statute as "unconditional and absolute," 649 F. 2d, at 221, it is obvious from the face of the statute that that description is not entirely accurate. At the time of expunction, a separate record is maintained, not destroyed, by the Supreme Court administrator. Iowa Code § 907.4 (1981). See Tr. of Oral Arg. 44. In addition, all "criminal history data" may be released to "criminal justice agencies." Iowa Code §§ 692.1(5) and 692.2 (1981). In short, the record of a conviction expunged under Iowa law is not expunged completely.

Under the decision below, perplexing problems would confront those required to enforce federal gun control laws as well as those bound by their provisions. Because, as we have noted, Title IV "is a carefully constructed package of gun control legislation," *Scarborough* v. *United States*, 431 U. S., at 570, Congress, in framing it, took pains to avoid the very problems that the Court of Appeals' decision inevitably would create, such as individualized federal treatment of every expunction law. Congress used unambiguous language in attaching gun control disabilities to any person "who has been convicted" of a qualifying offense. We give full effect to that language.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE BRENNAN, JUSTICE STEVENS, and JUSTICE O'CONNOR join, dissenting.

The Gun Control Act provides that any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" is ineligible for a federal license to ship, transport, or receive any firearm or ammunition in interstate commerce. 18 U. S. C. §§ 922(g) and (h). Thus, as the Court points out, "[i]f Kennison was not

'convicted' in the first place . . . respondent should not be ineligible for licenses on the grounds asserted by the Bureau." *Ante*, at 111. Contrary to the conclusion reached by the Court, I do not believe that Kennison was "convicted." Accordingly, I dissent.

I agree with the Court that whether one has been convicted within the meaning of the Gun Control Act is a question of federal, rather than state, law. *Ante*, at 111–112. Congress did not, however, expressly define the term "conviction" in the Act. Where Congress has defined the term, the Court recognizes that it has given the term different meanings in different statutes. *Ante*, at 112, n. 6. In the Investment Company Act of 1940, Congress expressly provided that the term "convicted" includes "a verdict, judgment, or plea of guilty, or a finding of guilt on a plea of nolo contendere, if such verdict, judgment, plea, or finding has not been reversed, set aside, or withdrawn, whether or not sentence has been imposed." 15 U. S. C. § 80a–2(a)(10). The same definition was used in the Investment Advisers Act of 1940. 15 U. S. C. § 80b–2(a)(6). Congress used a more narrow definition in two sections of the Narcotic Addict Rehabilitation Act of 1966, providing that " '[c]onviction' and 'convicted' mean the final judgment on a verdict or finding of guilty, a plea of guilty, or a plea of nolo contendere, and do not include a final judgment which has been expunged by pardon, reversed, set aside, or otherwise rendered nugatory." 18 U. S. C. § 4251(e); 28 U. S. C. § 2901(f). Finally, in the Federal Youth Corrections Act, Congress has provided that the term " 'conviction' means the judgment on a verdict or finding of guilty, a plea of guilty, or a plea of nolo contendere." 18 U. S. C. § 5006(g).

Thus at the most, Congress has required the entry of a formal judgment as the signpost of a "conviction." At the least, Congress has required the *acceptance* of a plea. In this case, we have neither. The Court relies on *Kercheval* v. *United States*, 274 U. S. 220 (1927), and *Boykin* v. *Alabama*, 395

U. S. 238 (1969), for the proposition that "[i]n some circumstances, we have considered a guilty plea alone enough to constitute a 'conviction.'" *Ante*, at 112. The Court concludes that in this case "we . . . have more," because the state trial judge "noted" the plea and placed Kennison on probation. *Ante*, at 113. I cannot agree.

Even if *Kercheval* and *Boykin* would otherwise be relevant to our interpretation of the Gun Control Act, both cases spoke of an accepted guilty plea. Whatever a trial court does when it "notes" a plea, it is less, instead of more, than an acceptance of the plea which is preceded by an examination of the defendant to insure that the plea is voluntary.

Where the Iowa deferred judgment statute can be used, "[t]he trial court may, *upon a plea of guilty [and] [w]ith the consent of the defendant* . . . defer judgment and place the defendant on probation." Iowa Code § 789A.1 (1977) (emphasis added) (current version at Iowa Code § 907.3 (1981)). Congress has never before considered such circumstances sufficient for a finding of a "conviction"; there is nothing in the Gun Control Act to infer that Congress has adopted such a standard now. It is likely that at the most Congress intended that a "conviction" be represented by a formal entry of judgment, or at the least an acceptance of a guilty plea. But in either case, such criteria are absent where, following a guilty plea, the Iowa deferred judgment statute is invoked.*

---

*The Court points out that respondent acknowledged in oral argument that during the period of Kennison's probation, respondent was disqualified for a license. *Ante*, at 114, n. 8. This disqualification, if it existed, however, would be based on the provision of the Gun Control Act applying to any person "who is under indictment," 18 U. S. C. §§ 922(g) and (h), rather than on a "conviction."