United States Court of Appeals
 For the First Circuit
 

No. 94-2026

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 GERALD R. CARON,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge] 

 

 Before

 Torruella, Chief Judge, Coffin, Senior Circuit Judge, 
 Selya, Cyr, Boudin, Stahl, and Lynch, Circuit Judges. 

 

 Owen S. Walker, Federal Public Defender, for appellant. 
 Timothy Q Feeley, Assistant U.S. Attorney, Brian T. Kelly, 
Assistant U.S. Attorney, Donald K. Stern, United States Attorney, for 
appellee.

 

 February 26, 1996
 

 OPINION EN BANC
 

 COFFIN, Senior Circuit Judge. Appellant Gerald R. Caron was 

convicted of possessing rifles, shotguns and ammunition in

violation of 18 U.S.C. 922(g)(1), the "felon-in-possession"

law. Because at least three of Caron's five predicate felony

convictions were for crimes of violence, he was subject to

sentence enhancement under the Armed Career Criminal Act

("ACCA"), 18 U.S.C. 924 (e)(1). Caron received a prison term

of 21 years, 10 months, plus a five year term of supervised

release. See U.S.S.G. 4B1.4.  

 The issue in this case is whether three prior Massachusetts

convictions should not be counted as predicate crimes under 18

U.S.C. 921(a)(20), which excludes as predicates

 [a]ny conviction which has been expunged, or set aside
 or for which a person has been pardoned or has had
 civil rights restored . . . unless such pardon,
 expungement, or restoration of civil rights expressly
 provides that the person may not ship, transport,
 possess, or receive firearms.

The questions we must address relate to the words preceding

"unless," and, in particular, the procedure by which one "has had

civil rights restored." Under Massachusetts laws of general

application, two of Caron's basic civil rights were restored

automatically after a lapse of time or at the expiration of his

sentence; the remaining one was never taken away from him. 

 In an earlier stage of this case, United States v. Caron, 

64 F.3d 713, 718 (1st Cir. 1995), a panel of this court, deeming

itself bound to follow United States v. Ramos, 961 F.2d 1003 (1st 

Cir. 1992), held that the requirements of 921(a)(20) can be met

only by "focused, individualized, affirmative action," not by

 -2-

laws of general or automatic application. We subsequently

decided to reconsider this holding en banc, allowed the panel 

opinion to remain in effect as to the other issues decided, and

asked for briefing on one additional issue: whether, as the

Ramos panel reasoned (regarding misdemeanors), 921(a)(20) 

cannot be satisfied where civil rights are not lost as a

collateral consequence of conviction, since there is "no

individualized official judgment" evidencing the state's "renewed

trust" in the individual. Ramos, 961 F.2d at 1009. 

 The government, after having filed a brief urging adoption

of the panel's position, notified us that it was no longer

defining the restoration of civil rights to exclude automatic

affirmative actions based on generic statutes. It nevertheless

did not retreat from its insistence that some affirmative action

was required to "restore" such rights. And it did not withdraw

its fallback contentions that Massachusetts statutes do not fully

restore the civil rights of convicted felons and, in any event,

expressly restrict their rights to possess firearms. 

Notwithstanding the government's change of position, which was

unexplained, we must arrive at our own independent judgment. 

 After due deliberation, we now hold, in accordance with our

seven sister circuits,1 that civil rights may be restored within
  

 1 McGrath v. United States, 60 F.3d 1005 (2d Cir. 1995); 
United States v. Hall, 20 F.3d 1066 (10th Cir. 1994); United 
States v. Glaser, 14 F.3d 1213 (7th Cir. 1994); United States v. 
Thomas, 991 F.2d 206 (5th Cir. 1993); United States v. Dahms, 938 
F.2d 131 (9th Cir. 1991); United States v. Essick, 935 F.2d 28 
(4th Cir. 1991); and United States v. Cassidy, 899 F.2d 543 (6th 
Cir. 1990). 

 -3-

the meaning of 921(a)(20) by laws of general application. We

also hold that, at least where some civil rights are restored by

the operation of such laws, the fact that one civil right was

never lost does not prevent an individual from having "had civil

rights restored" within the meaning of the provision. 

 BACKGROUND

A. Facts 

 We briefly set forth the relevant facts. On two occasions

in 1993, rifles, shotguns and ammunition were seized from Caron.

At the time of his arrest, his criminal record included three

Massachusetts felony convictions (1958, 1959, and 1963), a

California felony conviction (1970), and a federal firearms

felony conviction (1977). All four state convictions constituted

violent crimes which could serve as predicates under the ACCA.

See 18 U.S.C. 924(e)(2)(B). 

B. Massachusetts Statutory Scheme 

 "Civil rights," within the meaning of 921(a)(20), have

been generally agreed to comprise the right to vote, the right to

seek and hold public office, and the right to serve on a jury.

United States v. Cassidy, 899 F.2d 543, 549 (6th Cir. 1990). As 

an initial matter, therefore, we recount the relevant

Massachusetts laws corresponding to these rights. 

 A convicted felon in Massachusetts does not lose the right

to vote. See Mass. Gen. L. ch. 54, 86, 103B. He does, 

however, lose the right to hold public office while serving his

sentence. Mass. Gen. L. ch. 279, 30. And, a felon is

 -4-

disqualified from juror service until seven years from his

conviction. Mass. Gen. L. ch. 234A, 4. However, even after

seven years, a judge can remove one from a jury panel solely on

the basis of a prior felony conviction. Mass. Gen. L. ch. 234, 

8.

 Clearly, the Massachusetts scheme neither provides for

"individualized, affirmative actions" nor for complete

"restoration," as the right to vote is never removed. Ramos, 

therefore, on both fronts, would mandate that Caron's

Massachusetts convictions count for purposes of the ACCA. Now,

sitting en banc, we revisit the question whether we should depart 

from the positions we took in Ramos. 

 DISCUSSION 

A. Restoration of Civil Rights: Individualized Acts Only? 

 We approach the task of statutory interpretation with the

following guideline foremost in mind:

 So long as the statutory language is reasonably
 definite, that language must ordinarily be regarded as
 conclusive (at least in the absence of an unmistakable
 legislative intent to the contrary).

United States v. Charles George Trucking Co., 823 F.2d 685, 688 

(1st Cir. 1987) (citations omitted).

 The key words of 18 U.S.C. 921(a)(20) are "expunged," "set

aside," "pardoned," and "civil rights restored." All of the

words signify a result: strike out, efface, eliminate (expunge);

dismiss, discard, annul (set aside); excuse an offense without

punishment, release an offender from punishment (pardon); bring

 -5-

back to an original state or condition (restore).2 They do not

address the means by which the results may be accomplished or,

consequently, indicate preference for any particular means. 

 In Ramos, our panel assumed that pardons, expungements and 

restorations of rights all involved individualized official

judgments and procedures. 961 F.2d at 1010. But the wide variety

of practices adopted by states has since been pointed out. In

United States v. Glaser, 14 F.3d 1213, 1218 (7th Cir. 1994), the 

court noted that "[n]either pardons nor expungements are

necessarily individualized," citing mass pardons by both

Presidents Jefferson and Carter, and federal and state laws

providing for "routine expungement" of convictions for juvenile

offenses.

 In McGrath v. United States, 60 F.3d 1005, 1008 (2d Cir. 

1995), the court recognized that "many states restore civil

rights to convicted felons by means of a general law stating that

all rights shall be reinstated upon the service of a sentence."

It also noted that other states authorize officials to issue

certificates of restoration after a given period of time

following sentence or parole, while a minority of states "restore

rights in piecemeal fashion," and twelve states apparently have

no provision regarding restoration of civil rights. 

 Perhaps even more significantly, in Dickerson v. New Banner 

Inst., Inc., 460 U.S. 103 (1983), the Supreme Court recognized 
  

 2 These synonyms are substantially common to The Random 
House Dictionary (2d ed. 1987), Webster's Third New International 
Dictionary (1976), and The American Heritage Dictionary (1973).  

 -6-

the diversity of state post-conviction actions such as

expungement. It noted that over half the states had enacted such

statutes and that they varied "in almost every particular,"

ranging from applicability only to young offenders or certain

offenses to automatic expunction, and amounted to "nothing less

than a national patchwork." Id. at 121-22. The Court reasoned 

that the purpose of the federal firearms statute "would be

frustrated by a ruling that gave effect to state expunctions,"

id. at 119, and reversed a lower court ruling that had given full 

effect to a state expungement following a successfully served

period of probation.3

 Congressional reaction to Dickerson in large part accounted 

for the crafting of 921(a)(20), which expressly allowed state

law to define a predicate conviction for purposes of the federal

firearms laws.4 See McGrath, 60 F.3d at 1009. In interpreting 

 921(a)(20), therefore, we take into account not only the

diversity of state approaches to the restoration of civil rights

of convicted felons but also the clearly manifested purpose of

Congress to defer to state laws, in this context, in determining
  

 3 The firearm disabilities were imposed by 18 U.S.C. 
922(g) and (h), enacted under Title IV of the Omnibus Crime
Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82
Stat. 226 (1968) (as amended by the Gun Control Act of 1968, Pub.
L. No. 90-618, 82 Stat. 1214 (1968)). In 1986, the Firearms
Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986),
amended this law by, inter alia, changing 921(a)(20) to its 
current form.

 4 The sentence preceding the sentence at issue here
provides that "[w]hat constitutes a conviction . . . shall be
determined in accordance with the law of the jurisdiction in
which the proceedings were held." 18 U.S.C. 921(a)(20).

 -7-

predicate convictions and the removal of firearm

disqualifications. As the Court stated in Dickerson, "[a]s in 

all cases of statutory construction, our task is to interpret the

words of [the statute] in light of the purposes Congress sought

to serve." 460 U.S. at 118 (quoting Chapman v. Houston Welfare 

Rights Org., 441 U.S. 600, 608 (1979)). 

 In light of this background, we discern no basis for reading

into the words at issue any gloss based on assumed frequency of

use or primacy of meaning. And, we hesitate to impose a

qualification upon these words absent some textual indication

that such limitation is warranted.5 Accordingly, we conclude

that the plain language of 921(a)(20) makes clear that the

restoration of civil rights need not be focused or

individualized.

  

 5 We do not overlook a plausible reading of the last clause
of 921(a)(20) ("unless such pardon . . . expressly provides
that the person may not . . . possess . . . firearms"), which the
panel in Ramos found supported its interpretation that 
individualized action was required. 961 F.2d at 1008. But we
think an interpretation consistent with a broader reading is
provided by Glaser, 14 F.3d at 1218:  

 A person who contends that state statutes have restored
 all of his civil rights . . . [requires us] to examine
 the whole of state statutory law to determine whether
 the state treats him as "convicted" for the purpose of
 possessing firearms. When the state gives the person a
 formal notice of the restoration of civil rights,
 however, the final sentence of 921(a)(20) instructs
 us to look, not at the content of the state's statute
 books but at the contents of the document.

This interpretation jibes with the Court's instruction in Beecham 
v. United States, 114 S. Ct. 1669, 1671 (1994), to focus on "the 
plain meaning of the whole statute -- not of isolated sentences."

 -8-

 From our present perspective, therefore, we see no need to

look into legislative history.6 See Summit Inv. and Dev. Corp. 

v. Leroux, 69 F.3d 608, 610 (1st Cir. 1995) ("Plain statutory 

language does not prompt recourse to countervailing legislative

history."). Nonetheless, given that we initially reached a

contrary conclusion, and to ensure that there is not "a clearly

expressed legislative intent to the contrary," Dickerson, 460 

U.S. at 110 (internal quotation marks and citation omitted), we

take a brief foray into the legislative history of 921(a)(20).

 Our review leads us to the conclusion that the legislative

history of the provision "'is more conflicting than the

[statutory] text is ambiguous.'" United States v. Aversa, 984 

F.2d 493, 499 n.8 (1st Cir. 1993) (en banc) (quoting Wong Yang 

Sung v. McGrath, 339 U.S. 33, 49 (1950)). We begin with the 

statutory predecessors of 922(g)(1), 18 U.S.C. App. 1201-

1203, which proscribed, inter alia, the possession of firearms by 

  

 6 We note that the other circuits have, almost without
exception, focused their analysis on the statutory language,
rather than the legislative history. See Hall, 20 F.3d at 1069 
("'[R]estored' . . . does not suggest that the action must be
individualized."); Glaser, 14 F.3d at 1218 ("Nothing in  
921(a)(20) distinguishes according to the frequency with which a
state dispenses some boon."); Thomas, 991 F.2d at 213("[R]ights . 
. . reinstated automatically by operation of law . . . are no
less 'restored' than are such rights that have been resurrected
by an 'affirmative act' of the state."); United States v. Gomez, 
911 F.2d 219, 221 (9th Cir. 1990) ("If Congress intended to
require an individual affirmative act of restoration by the
state, Congress could have so provided."). But see Cassidy, 899 
F.2d at 546 (relying on legislative history after concluding
that it was not clear whether 921(a)(20) contemplated looking
only at a discrete document or the whole law of a state).

 -9-

a convicted felon, id. 1202(a)(1), but exempted a person who 

had "expressly been authorized by the President or such chief

executive [of a state] to . . . possess . . . a firearm." Id.  

1203(2). There was no comparable pardon provision applicable to

the shipping or receipt of firearms under former 922(g)(1) and

(h)(1). 

 In 1981, S. 1030 was introduced, which, as revised,

contained essentially the language of the last sentence of 

921(a)(20). See Cassidy, 899 F.2d at 547. A Senate Judiciary 

Committee Report explained that the bill would repair the above

described inconsistency between 922 and 1202 by expanding the

pardon provision to encompass 922. See S. Rep. No. 476, 97th 

Cong., 2d Sess. 18 (1982). In addition, the explicit reference

to chief executives was dropped and the exemption was expanded to

include expungements and restorations of civil rights. See id.  

 While such expansion might indicate a movement away from

individualized action, other excerpts provide a contrary thrust.

For instance, to demonstrate the need for the bill, the report

expressly cited to Thrall v. Wolfe, 503 F.2d 313 (7th Cir. 1974), 

where the court held that a state pardon still did not permit one

to receive or purchase a firearm. See S. Rep. No. 476, at 18. 

Although the report made no mention of the kind of pardon in

Thrall, it was an individualized one. The report also used the 

following language to describe the last clause of 921(a)(20):

"In the event that the official granting the pardon, restoration 

of rights or expungement of record does not desire it to restore

 -10-

the right to firearm ownership, this provision is rendered

inapplicable where the order or pardon expressly provides that

the person may not possess firearms." Id. (emphasis added). And 

it referred to this last clause as providing "flexibility should

such a pardon or restoration be based upon considerations not

relating to fitness to own a firearm." Id. at 12. Taken 

together, these extracts might indicate that individualized

actions were intended. 

 Nonetheless, we note that S. 49, the successor to S. 1030,

was explained by Senator Hatch as addressing the problem created

by imposing federal sanctions on persons who "have had their full

civil rights restored pursuant to State law." He added: 

 This [bill] will accommodate State reforms enacted
 since 1968 which permit dismissal of charges after a
 plea and successful completion of a probationary
 period. Since the Federal prohibition is triggered by
 the States' conviction, the States' law as to what
 disqualifies an individual from firearms use should
 govern.

131 Cong. Rec. S8,689 (daily ed. June 24, 1985). Both the

reference to reforms and the linking of state power to define

both the triggering conviction and the conditions of

disqualification tilt toward the inclusion of generic

restorations of rights.

 It could be and has been argued that Congress, which has

held itself out as endeavoring to tighten laws against firearms

abusers, would not lightly turn over final decision power to the

states, allowing them in effect to nullify federal sanctions.

But, as the Second Circuit observed, 

 -11-

 The very decision to have restoration triggered by
 events governed by state law insured anomalous results.
 . . . They are the inevitable consequence of making
 access to the exemption depend on the differing laws
 and policies of the several states.

McGrath, 60 F.3d at 1009. 

 In summary, we discern no such clear and compelling evidence

of Congressional intent to limit restoration of civil rights to

individualized procedures and judgments as to change our

interpretation of what we deem to be unambiguous language.

Ramos' holding regarding the need for individualized action is 

overruled.

B. Restoration of Rights Not Taken Away 

 It remains for us to decide whether civil rights never taken

away can be said to be "restored." The Ramos panel, dealing with 

a person convicted of a misdemeanor, and therefore a person whose

civil rights were left untouched by Massachusetts law, concluded

that "restore" meant the giving back of what had been taken away.

It addressed the anomaly that those convicted of mere

misdemeanors could never have firearms while those convicted of

the most serious crimes could qualify, and responded that "[b]y

the affirmative act of pardon, expungement or restoration, the

state has declared its renewed trust in that person." 961 F.2d

at 1009.

 In McGrath, the Second Circuit agreed, rejecting the 

argument that not having suffered the loss of one's civil rights

is the "functional equivalent" of restoration, explaining, "[t]he

'restoration' of a thing never lost or diminished is a

 -12-

definitional impossibility." 60 F.3d at 1007. It discerned an

intent in the 1986 legislation to treat "a subsequent forgiveness

. . . as an acknowledgement of rehabilitation or an affirmative

gesture of goodwill that merited exemption from the firearms

bar." Id. And, as far as the probability of "anomalies" was 

concerned, the court, as we have noted, deemed this as

inevitable. It concluded that only Congress or the particular

state can properly address the problem.

 This reasoning, admittedly technical, is not easily

dismissed. The use of the word "restore" calls for some

affirmative act by the state. It is not cavalierly ignored. In

the instant case, however, we are not confronted with a total

absence of affirmative action, as in Ramos and McGrath. Here, 

affirmative action has taken place with respect to the right to

sit on a jury (subject to some contingency) and the right to hold

public office. Only the right to vote was not taken away. The

words of 921(a)(20) literally apply: Caron is "a person [who]

. . . has had civil rights restored." In this case, therefore,

the dictates of both literalism and sense are met. 

 We leave till another day the question whether, when one 

civil right is restored but two were never taken away, the same

answer would prevail, together with the basic question whether

the literal application of "restore" to a case where no civil

rights were taken away is so lacking in sense as to command the

same result. We acknowledge, however, that, contrary to Ramos' 

holding, the "restoration" requirement does not automatically

 -13-

exclude the possibility that rights never taken away can

sometimes be viewed as rights restored. In addition, we note

that 921(a)(20) would seem to be in need of revisiting by the

Congress so that the problems that have busied the courts might

be resolved in harmony with legislative intent.

 * * *

 Our two holdings do not dispose of this case. There remain

other asserted issues, including whether the right to sit on a

jury has been sufficiently restored, and whether there has been

an express provision that appellant may not possess firearms. We

must leave to the district court the determination whether these

and other issues have been raised and preserved, and their

disposition on the merits.

 The judgment is vacated and the matter remanded to the 

district court for resentencing. As to all other issues in the 

case, the original panel opinion shall remain in full force. 

 -14-