Michael L. **BURDITT**, M.D., Petitioner,

v.

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–4611.

United States Court of Appeals,
Fifth Circuit.

July 9, 1991.

---

William Dewitt Alsup, Corpus Christi, Donald P. Wilcox, Gen. Counsel, Hugh M. Barton, Asst. Gen. Counsel, Tex. Med. Assoc., Austin, Tex., for petitioner.

Kimberly Davenport, San Francisco, Cal., for amicus curiae Cal. Med. Ass'n.

Mark E. Haddad, Carter G. Phillips, Sidley & Austin, Washington, D.C., for amicus curiae American Med. Ass'n.

Charles W. Bailey, Austin, Tex., for amicus curiae Tex. Hosp. Assoc.

Leslie M. Shaw, John J. Meyer, Dept. of HHS, Office of Gen. Counsel, Inspector Gen. Div., and Michael J. Astrue, Gen. Counsel, David V. Foster, Sp. Asst., USDHH, Washington, D.C., for respondent.

Mike Driscoll, County Atty., Dori A. Wind, Asst. County Atty., Houston, Tex., for amicus curiae Harris County Hosp. Dist.

Ann Torregrossa, Chester, Pa., G. Gordon Bonneyman, Legal Service of Middle Tenn., Nashville, Tenn., for amici curiae Pa. Consumer Subcommittee, et al.

Ronald Ellis, Julius Levonne, Chambers, Marianne Lado, NAACP Legal Defense and Ed. Fund, Inc., and Alison Wetherfield, Martha F. Davis, NOW Legal Defense and Ed. Fund, New York City, for amici curiae NAACP Legal Def. and Ed. Fund, et al.

David C. Vladeck, Public Citizen Litigation Group, Washington, D.C., for amici curiae Congressman Henry Waxman, et al.

James L. Feldesman, Jacqueline C. Leifer, Roger A. Schwartz, Feldesman, Tucker, Leifer, Fidell & Bank, Washington, D.C., for amici curiae Assoc. of Maternal and Child Health Programs and Nat. Assoc. of Comm. Health Centers.

Brenda Willett, East Tex. Legal Services, Nacogdoches, Tex., for amici curiae Doris Spencer, Lendy Gooch, et al.

Michael T. Isbell, Evan Wolfson, New York City, and Ruth Eisenberg, Washington, D.C., for amici curiae Lamda Legal Def., etc.

Before REAVLEY, HIGGINBOTHAM and DUHÉ, Circuit Judges.

REAVLEY, Circuit Judge:

Hospitals that execute Medicare provider agreements with the federal government pursuant to 42 U.S.C. § 1395cc must treat all human beings who enter their emergency departments in accordance with the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.[1] Hospitals and responsible physicians found to have violated EMTALA's requirements are subject to civil money penalties. The present appeal is from the order of an executive appeals board of the Department of Health and Human Services (DHHS) assessing a $20,000 fine against Dr. Michael L. Burditt. He contends on appeal that: 1) the government misconstrued EMTALA; 2) findings of fact establishing his violative conduct are not supported by substantial record evidence; and 3) EMTALA unconstitutionally takes the services of physicians without just compensation. We affirm and enforce.

## I. BACKGROUND

### A. Facts

Mrs. Rosa Rivera arrived in the emergency room of DeTar Hospital in Victoria, Texas at approximately 4:00 p.m. on December 5, 1986.[2] At or near term with her sixth child, she was experiencing one-minute, moderate contractions every three minutes and her membranes had ruptured. Two obstetrical nurses, Tammy Kotsur and Donna Keining, examined her and found indicia of labor and dangerously high blood pressure. Because Rivera had received no prenatal care, and had neither a regular doctor nor means of payment, Kotsur telephoned Burditt, who was next on DeTar's rotating call-list of physicians responsible

for such "unaligned" obstetrics patients. Upon hearing Rivera's history and condition, Burditt told Kotsur that he "didn't want to take care of this lady" and asked her to prepare Rivera for transfer to John Sealy Hospital in Galveston, Texas, 170 miles away. Burditt agreed to call back in five to ten minutes.

Kotsur and Keining told the nursing supervisor, Jean Herman, and DeTar's Administrator, Charles Sexton, of their belief that it would be unsafe to transfer Rivera. When Burditt called back, Keining told him that, according to Sexton's understanding of hospital regulations and federal law, Burditt would have to examine Rivera and personally arrange for John Sealy to receive her before he could legally transfer her. Keining asked Burditt for permission to start an intravenous push of magnesium sulfate as a precaution against convulsive seizures. Burditt told Keining to begin administering this medication only if Rivera could be transported by ambulance. He said that otherwise, Keining was not to administer intravenous treatment because Rivera would have to go to John Sealy by private car.

Burditt arrived at approximately 4:50 to examine Rivera. He confirmed her blood pressure to be the highest he had ever seen, 210/130, and he assumed that she had been hypertensive throughout her pregnancy. As the experienced head of DeTar's obstetrics and gynecology department, Burditt knew that there was a strong possibility that Rivera's hypertension would precipitate complications which might kill both Rivera and her baby. He also knew that the infants of hypertensive mothers are at higher-than-normal risk of intrauterine growth retardation. He estimated that Rivera's baby was six pounds— less than normal weight—and arranged her transfer to John Sealy, a perinatal facility better equipped than DeTar to care for underweight infants. Burditt obtained telephonic acceptance of Rivera from a Dr.

---

1. Unless otherwise noted, all references in this opinion to EMTALA are to the statute as it existed on December 5, 1986. *See* 42 U.S.C. § 1395dd (Supp. IV 1987).

2. Unless otherwise noted, all times cited in this opinion are *post meridian* on December 5, 1986.

Downing at John Sealy, and, per Downing's request, instructed Keining to administer magnesium sulfate intravenously and have Rivera transported by ambulance.

At approximately 5:00, Herman showed Burditt DeTar's guidelines regarding EMTALA, but he refused to read them. Burditt told Herman that Rivera represented more risk than he was willing to accept from a malpractice standpoint. Herman explained that Rivera could not be transferred unless Burditt signed a DeTar form entitled "Physician's Certificate Authorizing Transfer." Burditt asked for "that dang piece of paper" and signed his name under the following:

> I have examined the patient, ———, and have determined that, based upon the information available to me at this time, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the patient's medical condition from effecting [the] transfer. The basis for my conclusion is as follows: ———

Burditt listed no basis for his conclusion and remarked to Herman that "until DeTar Hospital pays my malpractice insurance, I will pick and choose those patients that I want to treat."

Burditt then went to care for another unaligned patient, Sylvia Ramirez, while the nurses arranged Rivera's transfer. They found another obstetrical nurse, Anita Nichols, to accompany Rivera to John Sealy. Burditt returned to the nurses' station and stayed there from 5:30 to 6:18. He never again examined Rivera or asked about her medical condition, though he inquired several times about the status of her transfer. Burditt delivered the Ramirez baby at 6:22. Afterward, Nichols told him the results of her examination of Rivera and informed him that the ambulance had arrived. Based exclusively on Nichols' statements, Burditt concluded that Rivera's condition had not changed since his examination two hours before. Burditt did not reexamine Rivera though he saw her being wheeled to the ambulance. He did not order any medication or life support equipment for Rivera during her transfer.

Nichols delivered Rivera's healthy baby in the ambulance approximately 40 miles into the 170–mile trip to John Sealy. She directed the driver to nearby Ganado Hospital to get a drug called pitocin to staunch Rivera's bleeding. While there, Nichols telephoned Burditt, who ordered her to continue to John Sealy despite the birth. Instead, per Rivera's wishes, Nichols returned Rivera to DeTar, where Burditt refused to see her because she failed to proceed to John Sealy in accordance with his instructions. Burditt directed that Rivera be discharged if she was stable and not bleeding excessively. A DeTar official pressed Burditt to allow Dr. Shirley Pigott to examine Rivera. Rivera stayed at DeTar under Pigott's care for three days and left in good health.

**B. PROCEDURAL HISTORY**

In mid–1988, the Inspector General of the United States Department of Health and Human Services (DHHS) demanded a $25,000 civil penalty from Burditt for violating EMTALA. After hearing the arguments of counsel and the testimony of eleven witnesses, an administrative law judge (ALJ) found that Burditt knowingly violated EMTALA in several ways but that mitigating circumstances warranted a reduction in the fine assessed against him to $20,000. Burditt appealed the ALJ's fact findings and legal conclusions to the Departmental Appeals Board (DAB) established by appellee Dr. Louis Sullivan, DHHS Secretary. After briefing and oral argument, DAB issued its "Final Decision" upholding the $20,000 civil penalty against Burditt. DAB sustained most of the ALJ's fact findings and legal conclusions, reversed four findings concerning mitigating circumstances and active labor, and modified three other findings. Burditt appeals DAB's Final Decision.

## II. DISCUSSION

We have jurisdiction to review DAB's Final Decision under 42 U.S.C.A. § 1320a–7a(e) (West Supp.1991). We will

uphold DAB's fact findings if they are "supported by substantial evidence on the record considered as a whole." *Id.* And a "court of appeals can only invalidate an administrator's interpretation [of a statute imposing a civil monetary penalty] if that interpretation is unreasonable." *Griffon v. United States Dep't of Health & Human Services,* 802 F.2d 146, 148 (5th Cir.1986).

## A. EMTALA VIOLATIONS

DeTar had executed a Medicare provider agreement pursuant to 42 U.S.C. § 1395cc and was obligated to treat Rivera in accordance with EMTALA.

### 1. Screening

Because Rivera presented herself to De-Tar's emergency department and a request was made on her behalf for care, EMTALA required DeTar to

> provide for an *appropriate* medical screening examination *within the capability of the hospital's emergency department* to determine whether or not an emergency medical condition ... exists or to determine if the individual is in active labor....

42 U.S.C. § 1395dd(a) (Supp. IV 1987) (emphasis added), *amended by* 42 U.S.C.A. § 1395dd(a) (West Supp.1991). The parties agree that DeTar appropriately screened Rivera and discovered that she had an "emergency medical condition"—severe hypertension—within the meaning of 42 U.S.C. § 1395dd(e)(1).[3]

### 2. Emergency Medical Condition and Active Labor

██ Patients diagnosed with an "emergency medical condition" or "active labor" must either be treated or be transferred in accordance with EMTALA. Burditt claims that Rivera received all of the care that she was due under EMTALA because he stabi-

lized her hypertension sufficiently for transfer and she was not in active labor when she left DeTar for John Sealy.

### a. Unstable Emergency Medical Condition

Rivera's blood pressure was 210/130 at 4:00 and 5:00. This was the last reading known to Burditt before he facilitated her transfer. Nurses also measured her blood pressure as 173/105 at 5:30, 178/103 at 5:45, 186/107 at 6:00, and 190/110 at 6:50. Experts testified that Rivera's hypertension put her at high risk of suffering serious complications, including seizures, heart failure, kidney dysfunction, tubular necrosis, stroke, intracranial bleeding, placental abruption, and fetal hypoxia. This is substantial, if not conclusive evidence that Rivera entered and exited DeTar with an emergency medical condition.

Burditt argues that he fulfilled EMTALA's requirements with respect to Rivera's hypertension by "stabilizing" it, or

> provid[ing] such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from [a] transfer....

42 U.S.C. § 1395dd(e)(4)(A) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(e)(3)(A) (West Supp.1991). He claims that the magnesium sulfate that he ordered for Rivera has an antihypertensive effect that complements its primary anticonvulsive purpose.

Development of any of the possible complications could have killed or seriously injured Rivera, her baby, or both, and thus would constitute a "material deterioration" under 42 U.S.C. § 1395dd(e)(4)(A). Any deterioration would "result" from transfer in that Rivera would have received better

---

**3.** EMTALA defines "emergency medical condition" as

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(A) placing the patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd (West Supp. 1991).

care for any complication at DeTar than in the ambulance. Thus, Burditt could not have stabilized Rivera unless he provided treatment that medical experts agree would prevent the threatening and severe consequences of Rivera's hypertension while she was in transit. DAB could properly disregard Burditt's testimony and accept that of all other testifying experts in holding that Burditt provided no such treatment, and thus did not stabilize Rivera's emergency medical condition.[4]

### b. Active Labor

EMTALA defines "active labor" as labor[5] at a time when

(B) there is inadequate time to effect safe transfer to another hospital prior to delivery, or

(C) a transfer may pose a threat [to] the health and safety of the patient or the unborn child.

42 U.S.C. § 1395dd(e)(2)(B)–(C) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(e)(1)(B) (West Supp.1991). This statutory definition renders irrelevant any medical definition of active labor. DAB affirmed the ALJ's finding that Rivera had begun active labor by the time Burditt authorized her transfer.

Though ambiguous, the foregoing section's attempt to categorize women in labor indicates that Congress intended to extend EMTALA's treatment and transfer protections to only a subset of all women in labor.

Consistent with the congressional objective of facilitating the efficiency of our nation's health care system, we interpret the provision to rationally select groups most needful of EMTALA's treatment and transfer protections.

■ Read literally, clause B confers active labor status on any woman who delivers her baby in transit. But this interpretation enshrines the use of hindsight as a legal standard and in so doing, protects an irrationally selected group of women. We think that clause B allows hospitals to transfer at will women in uncomplicated labor who, within reasonable medical probability, will arrive at another hospital before they deliver their babies. A hospital that transfers a woman in labor when the timing call mandated by clause B is close risks a battle of experts regarding anticipated delivery time, distance, and safe transport speed.

■ Burditt challenges the ALJ's finding that, at approximately 5:00, there was inadequate time to safely transfer Rivera to John Sealy before she delivered her baby. Dr. Warren Crosby testified that, based on Burditt's own examination results,[6] Rivera would, more likely than not, deliver within three hours after Burditt spoke with Downing at John Sealy. This expert testimony constitutes substantial record evidence to sustain the ALJ's finding.[7] Burditt does not challenge DAB's conclusion that the ambulance trip from

---

**4.** Curiously, DAB and the parties expend considerable effort addressing whether Burditt erred by not administering the drug apresoline to Rivera to lower her blood pressure before transport. This argument could not decide whether Rivera had an emergency medical condition and whether Burditt stabilized it.

**5.** All agree that labor begins with the onset of uterine contractions; Rivera began experiencing contractions before Burditt examined her at 4:50. Congress explicitly recognized this definition of "labor" in revising EMTALA. *See* 42 U.S.C.A. § 1395dd(e)(1)(B) (West Supp.1991).

**6.** Burditt's 4:50 examination revealed that Rivera had carried several pregnancies to term and that she had ruptured membranes, contractions beginning at 7:00 a.m. and becoming regular before 4:00, a cervix dilated to 3 centimeters, and a smaller-than-usual fetus.

**7.** Burditt argues that because no harm befell Rivera, the record evidence is equivocal as to whether there was inadequate time to effect a safe transfer to John Sealy. Given the emphasis of 42 U.S.C. § 1395dd(e)(2)(C) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(e)(1)(B)(ii) (West Supp.1991) on "the health and safety of the patient [and] the unborn child," we think that the word "safe" in 42 U.S.C. § 1395dd(e)(2)(B) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(e)(1)(B)(i) (West Supp. 1991) describes only the type of transfer a doctor is to consider in estimating transfer time. For example, Burditt would not have been entitled to estimate that Rivera's ambulance could travel 100 miles in an hour. Whether harm actually befalls a woman in transit is irrelevant to her active labor status.

DeTar to John Sealy takes approximately three hours. We therefore hold that DAB properly concluded that Rivera was in active labor under 42 U.S.C. § 1395dd(e)(2)(B).

■ The ALJ also found that Rivera was in active labor under clause C at the time Burditt examined her. There is always some risk of a vehicular accident in transit, so transfer always "may" pose a threat to the health and safety of the patient or fetus. But, as previously explained, Congress did not intend to accord active labor status to all women in labor, so we must discern what group Congress sought to protect with clause C. We have previously explained that Congress accords EMTALA's "treat or transfer" protection to those with conditions that would *seriously* impair the patient's health absent immediate medical care and those who will, within reasonable medical probability, deliver babies before safe transfer can be effected.

■ We must "give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). We can give required effect to clause C only by according active labor status to a group that would not necessarily qualify for EMTALA's "treat or transfer" protection under the definitions of emergency medical condition and active labor previously discussed.

We believe that Congress intended clause C to extend EMTALA's "treat or transfer" protection to women in labor who have any complication with their pregnancies regardless of delivery imminency. Because better medical care is available in a hospital than in an ambulance, whether a transfer "may pose a threat" under 42 U.S.C. § 1395dd(e)(2)(C) depends on whether the woman in labor has any medical

condition that could interfere with the normal, natural delivery of her healthy child. Under the statutory language, a woman in labor is entitled to EMTALA's treatment and transfer protections upon a showing of possible threat; it does not require proof of a reasonable medical probability that any threat will come to fruition. *Cf.* 42 U.S.C. § 1395dd(e)(4)(A) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(e)(3)(A) (West Supp.1991) (defining stabilization in terms of "reasonable medical probability"). For women to gain EMTALA's "treat or transfer" protection under 42 U.S.C. § 1395dd(e)(2)(C), Congress rationally required less of a showing of probability and severity of harm for women in labor than the general population under its definition of emergency medical condition.

[6] The record overwhelmingly confirms that Rivera's hypertension could have interfered with a normal delivery, and she was thus in active labor under 42 U.S.C. § 1395dd(e)(2)(C).

### 3. Treat or Transfer

Upon discovery of active labor or an emergency medical condition, EMTALA usually requires hospitals to treat the discovered condition.[8] Under certain circumstances, however, EMTALA allows hospitals to transfer patients instead of treating them. 42 U.S.C. § 1395dd(b)(1)(B). Because Burditt transferred Rivera without stabilizing her, whether he violated EMTALA depends on whether the manner in which he accomplished the transfer complies with the requirements of 42 U.S.C. § 1395dd(c).

#### a. Certification

A hospital may not legally transfer someone who has an emergency medical condition which has not been stabilized or who is

---

**8.** But Congress only mandates treatment "within the staff and facilities available at the hospital." 42 U.S.C. § 1395dd(b)(1) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(b)(1)(A) (West Supp.1991); *see also* H.R. REP. No. 241, 99th Cong., 1st Sess., pt. 1, at 27, *reprinted in,* 1986 U.S. CODE CONG. & ADMIN. NEWS 42, 579, 605 (hospitals must provide treatment "within their competence"). One may prove that a hospital has violated this standard by presenting evidence that something other than the present or projected medical needs of its patients determined the treatment provided. *See Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 271 (6th Cir.1990) (no unreasonable screening claim under EMTALA in absence of evidence that nonmedical considerations affected execution of screening examination).

in active labor unless the patient requests a transfer or

> a physician ... has *signed* a *certification* that, *based upon* the reasonable risks and benefits to the patient, and *based upon* the information available at the time, the medical *benefits* reasonably expected from the provision of appropriate medical treatment at another medical facility *outweigh* the increased *risks* to the individual's medical condition from effecting the transfer....

42 U.S.C. § 1395dd(c)(1)(A)(ii) (Supp. IV 1987) (emphasis added), *amended by* 42 U.S.C.A. § 1395dd(c)(1)(A)(ii)–(iii) (West Supp.1991).

■ A hospital may violate this provision in four ways. First, before transfer, the hospital might fail to secure the required signature from the appropriate medical personnel on a certification form. But the statute requires more than a signature; it requires a signed *certification*. Thus, the hospital also violates the statute if the signer has not actually deliberated and weighed the medical risks and the medical benefits of transfer before executing the certification.[9] Likewise, the hospital fails to make the certification required by 42 U.S.C. § 1395dd(c)(1)(A)(ii) if the signer makes an improper consideration a significant factor in the certification decision.[10] Finally, a hospital violates the statute if the signer actually concludes in the weighing process that the medical risks outweigh the medical benefits of transfer, yet signs a certification that the opposite is true.[11]

Whether a reasonable physician would have considered different medical factors than those considered by the signer, or would have weighted factors differently in reaching a certification decision, need not be considered in determining whether a hospital has violated 42 U.S.C. § 1395dd(c)(1)(A)(ii). The signer need not be correct in making a certification decision; the statute only requires a signed statement attesting to an actual assessment and weighing of the medical risks and benefits of transfer.

■ We find abundant record evidence to support DAB's finding that

> Burditt signed the "Physician's Certificate Authorizing Transfer" certifying that the risks of the transfer were outweighed by the benefits without actually engaging in any meaningful weighing of the risks and benefits....

Burditt himself testified that he was completely ignorant of EMTALA's requirements and did not believe that EMTALA governed his actions. He testified: "I didn't know what I was doing, but I signed her [certification] so I could send her." In his brief to this court, he explains that he signed Rivera's certification "because [Nurse] Herman insisted." The ALJ properly disregarded Burditt's self-serving, after-the-fact justification for transferring Rivera—that DeTar lacked facilities to care for Rivera's underweight infant. The record shows that upon hearing of Rivera's condition over the telephone, Burditt made an immediate and unwavering decision to

---

9. In revising EMTALA, Congress has expressly provided that medical personnel must make a *determination* regarding medical risks and benefits, not just sign a paper stating as much. *See* 42 U.S.C.A. § 1395dd(c)(1)(A)(iii) (West Supp. 1991).

10. Burditt characterizes his wish to avoid a malpractice suit by Rivera as a medical reason for transferring her. We agree that a physician's belief that others are more competent to perform a required procedure is a medical reason for transfer. But if the physician instead believes that the patient is likely to sue whomever provides treatment, and transfers to avoid suit, then the reason for the transfer is financial and nonmedical. We do not reach the question of which belief Burditt held when he stated that

"until DeTar pays my malpractice insurance, I will pick and choose those patients that I want to treat," because we do not understand DAB to have formally held that Burditt violated EMTALA by considering impermissible factors in weighing risks and benefits.

While we appreciate the predicament of physicians, they may not obligate themselves to hospitals receiving federal funds without accepting EMTALA's obligations.

11. Evidence that a signer was aware of certain medical risks and medical benefits before making a certification decision when that person claims not to have considered those risks and benefits may be used to prove this fourth class of violation under 42 U.S.C. § 1395dd(c)(1)(A)(ii).

transfer her without weighing the medical risks and benefits of transfer. Because he signed her transfer certification as a mere formality, it lacks legal effect as a certification.

Every reasonable adult, let alone physician, understands that labor evolves to delivery, that high blood pressure is dangerous, and that the desirability of transferring a patient with these conditions could well change over a two-hour period. Burditt's indifference to Rivera's condition for the two hours after he conducted his single examination demonstrates not that he unreasonably weighed the medical risks and benefits of transfer, but that he never made such a judgment. DAB's statement that Burditt certified "under circumstances where no reasonable [obstetrician] would have certified" means only that the facts of this case show certification to be so unacceptable that it is unlikely that Burditt actually made the required certification.

Thus, we affirm DAB's finding that Burditt violated EMTALA by transferring Rivera without complying with the certification requirement of 42 U.S.C. § 1395dd(c)(1)(A)(ii).

### b. Transfer Appropriateness

■ Besides certifying the medical need for transferring patients protected by EM-TALA, hospitals must appropriately transfer these people. 42 U.S.C. § 1395dd(c)(1)(B). The statutory definition of appropriate transfer requires, *inter alia*, that

> the transfer [be] effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer. . . .

42 U.S.C. § 1395dd(c)(2)(C) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(c)(2)(D) (West Supp.1991). The relative standard of EMTALA's screening and treatment requirements is conspicuously missing from this provision. *Compare* 42 U.S.C. §§ 1395dd(a), 1395dd(b)(1)(A) *with* 42 U.S.C. § 1395dd(c)(2)(C). Because Congress obviously was aware of the option of

requiring only relatively qualified personnel and transportation equipment, we understand 42 U.S.C. § 1395dd(c)(2)(C) to require personnel and transportation equipment that a reasonable physician would consider appropriate to safely transport the patient in question.

As previously explained, 42 U.S.C. § 1395dd(c)(1)(A)(ii) does not require a physician to correctly ascertain all risks and benefits associated with transfer. For this reason, we think that Congress inserted "as required" in 42 U.S.C. § 1395dd(c)(2)(C) to limit the scope of the requirement of qualified personnel and equipment to those conditions known to the transferring physician.

■ DAB correctly rejected Burditt's argument that he effected Rivera's transfer through qualified personnel and equipment by sending her to John Sealy in an ambulance that met state licensing requirements. *See* Tex. Dep't of Health, 25 Tex. Admin. Code § 157.67 (West August 4, 1988) (Basic Life Support Vehicle Requirements for a Permit). The standards set by § 157.67 ensure that medical transport vehicles are adequately prepared to perform their primary function of taking people from the scene of an illness or injury to a hospital for diagnosis and treatment. EMTALA prevents patient dumping by limiting transfers of people with emergency medical conditions or in active labor to those that are medically necessary and effected with qualified personnel and equipment. Section 157.67 ensures safe transfer when it is required while EMTALA limits when transfer is allowed. The purposes of these two laws do not coincide; fulfillment of one's requirements does not necessarily satisfy those of the other.

Burditt would limit the requirement of "qualified . . . transportation equipment" to the transport vehicle itself, excluding all other equipment necessary to ensure safe transfer of the patient. But 42 U.S.C. § 1395dd(c)(2)(C) includes "necessary and medically appropriate life support measures" within its definition of qualified transportation equipment. Also, EMTA-LA's legislative history indicates that Con-

gress intended "transfer [to] be made by proper personnel using equipment that meets health and safety standards." H.R. REP. No. 241, 99th Cong., 1st Sess., pt. 1, at 27, *reprinted in,* 1986 U.S. CODE CONG. & ADMIN.NEWS 579, 605. We thus read "transportation equipment" to include all physical objects reasonably medically necessary for safe patient transfer.

We now consider whether DAB correctly applied 42 U.S.C. § 1395dd(c)(2)(C). The record indicates that the obstetrical nurse and two emergency medical technicians who accompanied Rivera in transit were qualified to deliver Rivera's baby in the absence of complications. But it is undisputed that they were unqualified to perform a cesarean section or treat the other complications from Rivera's hypertension that could have developed.

The ALJ could properly credit expert testimony to the effect that only a physician could have fulfilled the "qualified personnel" requirement of 42 U.S.C. § 1395dd(c)(2)(C) in this case. Likewise, expert testimony substantially supports the ALJ's finding that because he did not order a fetal heart monitor for Rivera's ambulance, Burditt failed to effect the transfer through qualified transportation equipment.

We have not found similar record support for the ALJ's statement that qualified equipment for Rivera's ambulance also included the drug pitocin and a blanket for the newborn. But, as experts, Drs. Mark D. Akin and Robert T. Greene, Jr. testified that hypertensive women face increased risk of placental abruption, and without a fetal heart monitor in the ambulance, it would be almost impossible to perceive this condition during transport. This is sufficient evidence from which the ALJ could properly conclude that a reasonable physician would have included a fetal heart monitor as *equipment* to ensure Rivera's safe transfer.

We therefore affirm the ALJ's finding that Burditt violated the appropriate-transfer requirement of 42 U.S.C. § 1395dd(c)(1)(B).

#### 4. *Improper Motive*

Burditt asks this court to invent a requirement found nowhere in the statute that an improper, or nonmedical, motive for transfer must be proved as an element of all EMTALA transfer violations. As written, EMTALA prevents patient dumping without such a requirement. *See* H.R.REP. No. 241, 99th Cong., 1st Sess., pt. 1, at 27, *reprinted in,* 1986 U.S.CODE CONG. & AD-MIN.NEWS 579, 605 (Congress sought to prevent patient dumping with EMTALA). We refuse to alter the statutory scheme. *Cf. Cleland,* 917 F.2d at 269–70 (refusing to find that EMTALA covers only the indigent and uninsured absent explicit statutory limitation).

### B. CIVIL MONEY PENALTY

DAB affirmed the ALJ's decision to fine Burditt $20,000 under 42 U.S.C. § 1395dd(d)(2) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(d)(1)(B)–(C) (West Supp.1991), which provides that

> a participating hospital that knowingly violates a requirement of this section and the responsible physician in the hospital with respect to such a violation are each subject ... to a civil money penalty of not more than $25,000 for each such violation.

Burditt proffers several reasons why he should not be fined under this statute; we reject them all.

#### 1. *Responsible Physician*

The "responsible physician" subject to EMTALA's civil penalties is defined as one who

> (A) is employed by, or under contract with, the participating hospital, and
>
> (B) acting as such an employee or under such a contract, has professional responsibility for the provision of examinations or treatments for the individual, or transfers of the individual, with respect to which the violation occurred.

42 U.S.C. § 1395dd(d)(2) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(d)(1)(B)–(C) (West Supp.1991).

Burditt asserts that under controlling Texas law, he is not "under contract" with

DeTar. But "[i]n the absence of a plain indication to the contrary, ... it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983), quoting *NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 603, 91 S.Ct. 1746, 1748, 29 L.Ed.2d 206 (1971). Burditt offers nothing in EMTALA's language, purpose, or legislative history to indicate that Congress intended state law to determine when a physician is under contract with a hospital. We recognize no reason for conditioning the applicability of EMTALA's civil penalty provision on the vagaries of the several state laws. Equivalent violative actions by physicians should be deterred with equivalent fines. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). DAB correctly held that federal law controls the issue of whether a physician is "under contract" with a hospital for purposes of 42 U.S.C. § 1395dd(d)(2).

We also agree with DAB that a physician is "under contract" with a hospital when, pursuant to their mutual agreement, the physician examines and treats or transfers people who are covered by EMTALA, regardless of whether the agreement refers to EMTALA. In his 1974 application to DeTar for staff privileges, Burditt agreed to be bound by DeTar's bylaws. Pursuant to those bylaws, Kotsur took Burditt's name from DeTar's call-list of physicians responsible for unaligned obstetrical patients. Burditt falls squarely within EMTALA's definition of a responsible physician.

### 2. DeTar's EMTALA Violation

Under 42 U.S.C. § 1395dd(d)(2), responsible physicians may be fined only "with respect to" a hospital's knowing EMTALA violation. Burditt complains that DeTar was not joined as a party to the proceedings against him. But unless the Inspector General seeks a civil penalty against it, the hospital need not be party to a proceeding against a physician. Adjudication of hospital liability in such a proceeding is merely an element in the case against the physician and is not binding on the hospital.

DAB correctly held that hospital physicians who treat patients in fulfillment of their contractual responsibilities are the hospital's agents for purposes of such treatment. Because hospitals can act and know things only vicariously through individuals, *see United States v. A & P Trucking Co.*, 358 U.S. 121, 125, 79 S.Ct. 203, 206, 3 L.Ed.2d 165 (1958), any EMTALA violation by such a physician is also a violation by the hospital. Thus, record evidence of Burditt's knowing EMTALA violation is evidence of DeTar's knowing violation.

### 3. Requisite Mental State

A responsible physician may be fined only if that person "knowingly violated [an EMTALA] requirement." 42 U.S.C. § 1395dd(d)(2) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(d)(1)(B)–(C) (West Supp.1991). By making the object of the knowing violation EMTALA's *requirements* as opposed to EMTALA itself, Congress predicated liability on a physician's violative action or inaction undertaken with knowledge of *facts* such that the action or inaction constitutes a violation. Liability attaches regardless of the physician's understanding of the statute.

The ALJ interpreted the word "knowingly" in conformance with the False Claims Act, 31 U.S.C:A. § 3729(b) (West Supp. 1991), and held that it encompasses actual knowledge, deliberate ignorance, and reckless disregard of operative facts. All agree that actual knowledge and deliberate ignorance of operative facts can form the basis of a knowing violation, but Burditt challenges the ALJ's determination that action taken while recklessly disregarding such facts is also sufficient. We presently decline to decide whether liability under EMTALA may be predicated on a physician's reckless disregard of operative facts.

DAB found that, in at least one manner, Burditt violated EMTALA because he actually knew all facts necessary to establish the violation. Thus, the ALJ's legal inter-

pretation of "knowingly" was unnecessary to this case's outcome. Moreover, Congress has since amended EMTALA to allow the federal government to fine physicians who negligently violate EMTALA's requirements. 42 U.S.C.A. § 1395dd(d)(1)(B) (West Supp.1991). Thus, it is not clear that the mental-state question posed by Burditt will ever need to be answered by a court.

By examining Rivera, Burditt gained actual knowledge of her hypertension and labor, which DAB correctly labeled an emergency medical condition and active labor. Burditt stipulated that he arranged for and ordered Rivera's transfer. We have previously affirmed DAB's finding that Burditt did not engage in the weighing process that we hold to be required by 42 U.S.C. § 1395dd(c)(1)(A)(ii). Because the requisite weighing process is a mental exercise, it must be true that Burditt actually knew that he did not weigh the medical risks and benefits to Rivera from the transfer in deciding to transfer her. In this way, Burditt knowingly violated EMTALA's requirements by transferring Rivera while aware of the facts that made his transfer a violation.

Burditt argues that he cannot be fined under EMTALA because he transferred Rivera in a good-faith effort to protect her underweight infant. But nothing in EMTALA admits the existence of a good-faith exception.

We affirm DAB's conclusion that Burditt knowingly violated an EMTALA requirement.

### 4. Aggravating and Mitigating Circumstances

■ DAB's final $20,000 penalty assessment against Burditt comports with EMTALA's limit of $25,000 per knowing violation and our verification of at least one knowing violation. *See* 42 U.S.C. § 1395dd(d)(2) (Supp. IV 1987), *amended by* 42 U.S.C.A. § 1395dd(d)(1)(B)–(C) (West Supp.1991). EMTALA provides no standard for deciding civil sanction amounts, but it includes its provisions as "grounds for imposition of a civil money penalty under section 1320a–7a(a) of [title 42]." *Id.*

And 42 C.F.R. § 1003 implements 42 U.S.C.A. § 1320a–7a(a) (West Supp.1991). 42 C.F.R. § 1003.100(a). Thus, we agree with DAB that while parts of 42 C.F.R. § 1003 are plainly inapplicable to EMTALA actions, the ALJ could properly determine Burditt's fine amount using 42 C.F.R. § 1003.106(b)(5), which states:

> circumstances of an aggravating or mitigating nature should be taken into account if, in the interests of justice, they require either a reduction of the penalty … or an increase in order to assure the achievement of the purposes of this part.

Congress intended EMTALA's civil sanctions largely to deter violations. H.R.REP. No. 241, 99th Cong., 1st Sess., pt. 3, at 7, *reprinted in*, 1986 U.S.CODE CONG. & AD-MIN.NEWS 726, 729. Although 42 C.F.R. § 1003.106(b)(5) does not express the most determinate of standards, the Supreme Court teaches that

> where Congress has entrusted an administrative agency with the responsibility of … achieving the statutory policy "the relation of remedy to policy is peculiarly a matter for administrative competence."

*Butz v. Glover Livestock Commission Co.*, 411 U.S. 182, 185, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946). We will affirm DAB's determination of the penalty amount unless, based on the totality of the record, its decision constitutes an abuse of discretion. *Butz*, 411 U.S. at 188, 93 S.Ct. at 1459.

As aggravating circumstances, the ALJ found that Burditt: 1) did not examine Rivera after his initial examination; 2) did not attempt to consult another doctor; 3) did not read the copy of the law given to him by Herman; and 4) did not treat Rivera upon her return to DeTar. As mitigating circumstances, the ALJ found that: 1) Rivera had received no prenatal care; 2) DeTar had no medical records of Rivera's health history; and 3) Burditt has instituted corrective measures to prevent future illegal transfers from DeTar.

We agree with DAB that substantial record evidence establishes the existence of

all of the circumstances found to be aggravating or mitigating. We also agree that the ALJ properly characterized four of Burditt's acts as aggravating circumstances because they demonstrate flagrant disregard for the anti-dumping principles that Congress enshrined in EMTALA. Similarly, we think that DAB correctly held that a patient's lack of prenatal care or medical records cannot operate as a mitigating circumstance without undermining EMTALA's primary, though not exclusive, purpose of protecting the indigent. *See Johnson v. American Airlines, Inc.*, 745 F.2d 988, 992 (5th Cir.1984) (court's objective in statutory interpretation "is to ascertain congressional intent and give effect to legislative will"), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985).

We find no error in DAB's conclusion as to the amount of Burditt's sanction.

### C. EMTALA's CONSTITUTIONALITY

■■■ As his final attempt to escape DAB's assessment, Burditt claims that EMTALA effects a public taking of his services without just compensation in contravention of the Constitution's Fifth Amendment.

Assuming *arguendo* that professional services constitute property protected by the Takings Clause,[12] Burditt has not shown that EMTALA effects a taking. EMTALA imposes no responsibilities directly on physicians; it unambiguously requires *hospitals* to examine and stabilize, treat, or appropriately transfer all who arrive requesting treatment. Its provision for sanctions against physicians who knowingly violate its requirements is merely an enforcement mechanism that does not alter its explicit assignment of duties.

Governmental regulation that affects a group's property interests "does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir.) (temporary freeze of Medicare payments is no taking because physicians are not required to

treat Medicare patients), *cert. denied*, 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986); *accord Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Public Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (state law limiting fees that nursing homes voluntarily participating in Medicaid may charge non-Medicaid patients effects no taking "[d]espite the strong financial inducement to participate in Medicaid"), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

Two levels of voluntariness undermine Burditt's taking assertion. Only hospitals that voluntarily participate in the federal government's Medicare program must comply with EMTALA. *See* 42 U.S.C. § 1395cc(a)(1)(I) (West Supp.1991) (hospitals eligible to receive Medicare payments if they agree, *inter alia*, to comply with EMTALA). Hospitals must consider the cost of complying with EMTALA's requirements in deciding whether to continue to participate in the Medicare program.

Second, Burditt is free to negotiate with DeTar or another hospital regarding his responsibility to facilitate a hospital's compliance with EMTALA. Thus, physicians only voluntarily accept responsibilities under EMTALA if they consider it in their best interest to do so. Accordingly, Burditt's claim under the Takings Clause is without merit.

### III. CONCLUSION

The determination of the Secretary through his Departmental Appeals Board is AFFIRMED and ENFORCED.

---

**12.** *But see White v. United States Pipe & Foundry Co.*, 646 F.2d 203, 205 n. 3 (5th Cir. Unit B 1981) (attorney services not protected property under Fifth Amendment's Takings Clause).