**QANTAS AIRWAYS LIMITED,**
a foreign corporation,

v.

The **UNITED STATES.**

No. 118–89T.

United States Court of Federal Claims.

March 28, 1994.

John Mahoney, San Francisco, CA, attorney of record, for plaintiff.

Robert J. Higgins, Washington, DC, with whom was Acting Asst. Atty. Gen. James A. Bruton, for defendant.

## OPINION

YOCK, Judge.

The plaintiff in this action is an international airline owned and controlled by the Australian government. It seeks to recover over $1.8 million in income taxes it paid to the United States Government on rental and capital gains income for the tax years ending March 31, 1983, 1984, and 1985. The plaintiff alleges that this income was exempt from taxation under the former section 892 of the Internal Revenue Code (1982)[1], the foreign government exemption, and the former section 883 of the Internal Revenue Code (1982), the exemption for income from the international operation of aircraft. Trial was held on April 20, 21, and 22, 1993, in San Francisco, California, to examine the applicability of these two provisions and to determine the validity of Treas. Reg. § 1.892 (1982).

Upon full consideration of the entire record, this Court concludes that the plaintiff's rental and capital gains income for the tax years ending March 31, 1983, 1984, and 1985 was exempt from taxation under 26 U.S.C. § 892 (1982), and that Treas. Reg. § 1.892–1 (1982) was invalid insofar as it purported to limit the availability of the exemption to income derived from investment activities.

### Background

#### A. Factual History

The plaintiff, Qantas Airways Limited ("Qantas"), is an Australian corporation wholly owned and controlled by the Australian government. Qantas operates an international airline with scheduled flights to various destinations throughout the world. In the nomenclature of the Australian government, Qantas is a "Government Business Enterprise," and the Australian government occupies the role of the sole beneficial shareholder. Although Qantas operates as a separate commercial enterprise with all of its earnings credited to its own corporate accounts, all dividends and assets accrue to the Australian government in the event of the company's dissolution.

The present dispute concerns taxes that Qantas paid on income derived from two sources in the United States for the tax years ending March 31, 1983, 1984, and 1985. The first source was the lease of excess office space in Qantas' Americas Region Headquarters. Throughout the tax years in question, Qantas' headquarters for its Americas Region (North, Central and South America) was located in an eleven-story office building at 360 Post Street, San Francisco, California. Qantas owned the building and occupied a portion of it for its own downtown ticket office and executive and other offices. Qantas leased out those parts of the building not required for its own operations to various tenants, including the Australian consulate,

1. The Tax Reform Act of 1986, Pub.L. No. 99–514, § 1247, 100 Stat. 2085, 2583, amended section 892 and codified the regulatory interpretation that income of foreign governments or their controlled entities is not exempt from federal income tax if it was derived from commercial activities. Neither party disputes that the income at issue in this case would be taxable under the current enactment of section 892.

which occupied three floors of the building during the years at issue here. The principal tenants included several other airlines and entities involved in the travel industry, along with one or two nonrelated businesses.

Qantas charged each of its tenants base rent at the market rate and passed along any yearly increases in operating costs to each tenant pro rata through an increase in rent, depending upon the number of square feet in the building that the tenant occupied. Qantas maintained an in-house property management department to maintain the property and negotiate leases, some of which provided for alterations to the office space to either keep an existing tenant or attract a new tenant.

The second source of income was from eight single-family residences owned by Qantas in the City of Millbrae, a suburb of San Francisco close to the San Francisco International Airport. The houses at issue are among approximately 25 single-family homes in the City of Millbrae purchased by Qantas in 1966 to house Australian nationals employed by Qantas as cabin crews and management employees in the United States. The Qantas employees did not pay rent for the use of the homes.

Starting sometime in the 1970's, Qantas changed its policy on overseas personnel and began returning its Australian employees from the United States to positions in Australia and filling their jobs here with United States citizens. As this change in personnel took place, Qantas had progressively less need for the Millbrae houses.

In the 1970's and 1980's, Qantas gradually sold off all of the houses on the open market at a rate of two or three a year. During this time, Qantas rented out some of the houses on a short-term basis to people who were not Qantas employees in an effort to minimize the possibility of vandalism and to ensure proper upkeep and maintenance. Income relating to eight of the houses, which Qantas sold at various times in the tax years ending March 31, 1983, 1984, and 1985, is at issue here. This income consists primarily of long-term capital gains, but also of approximately $10,000 received from non-Qantas personnel for short-term rentals of a few of the houses before they were sold.

Qantas filed federal income tax returns for the three years in question which reported as taxable income the rents on 360 Post Street, the rents from the short-term rentals of the Millbrae houses, and capital gains on the Millbrae houses. All three categories of income are in dispute here.

## B. Statutory History

The legislative underpinnings of this case originated over seventy years ago with the passage of the War Revenue Act of 1917. Section 30 of the War Revenue Act of 1917 provided that certain income of foreign governments earned in the United States was to be exempt from taxation. The relevant language provided as follows:

> [N]othing in section II of the [Income Tax Act of 1913] or in this title, shall be construed as taxing the income of foreign governments received from investments in the United States in stocks, bonds, or other domestic securities, owned by such foreign governments, or from interest on depostits [sic] in banks in the United States of moneys belonging to foreign governments.

War Revenue Act, § 30, ch. 63, 40 Stat. 300, 337 (1917).

Early in 1919, Congress restated and reenacted the federal income tax law in the Revenue Act of 1918, Ch. 18, 40 Stat. 1057 (1919). Section 213 of that Revenue Act expanded the foreign government exemption introduced previously in the War Revenue Act of 1917 to exempt from taxation a broader range of income. Included among the items excluded from gross income and exempted from taxation were the following:

> The income of foreign governments received from investments in the United States in stocks, bonds, or other domestic securities, owned by such foreign governments, or from interest on deposits in banks in the United States of moneys belonging to such foreign governments, *or from any other source within the United States* * * *.

Revenue Act of 1918, § 213(b)(5), ch. 18, 40 Stat. at 1065–66 (1919) (emphasis added). The primary difference between this version of the foreign government exemption and the previous version enacted in 1917 was the addition of the language exempting income "from any other source within the United States." *See id.*

Language identical to that used in the Revenue Act of 1918 appeared in each Revenue Act through the 1938 Revenue Act and in the Internal Revenue Code of 1939. The 1939 Code was modified in 1945 to include international organizations in the exemption and was reenacted with slight change in form as section 892 of the Internal Revenue Code. International Organizations Immunities Act, § 4(a), ch. 652, 59 Stat. 669, 670 (1945). Aside from the inclusion of language pertaining to international organizations in 1945, the language of section 892 as it existed during the tax years at issue remained essentially unchanged since its debut in 1918. Thus, during the tax years at issue and prior to the Tax Reform Act of 1986, section 892 of the Internal Revenue Code ("former section 892") provided the following:

> The income of foreign governments or international organizations received from investments in the United States in stocks, bonds, or other domestic securities, owned by such foreign governments or by international organizations, or from interest on deposits in banks in the United States of monies belonging to such foreign government or international organizations, or from any other source within the United States, shall not be included in gross income and shall be exempt from taxation under this subtitle.

26 U.S.C. § 892 (1982).

## C. *Administrative History*

Although former section 892 of the Code did not define the term "foreign government," in the early years, the Bureau of Internal Revenue ("Bureau") extended the foreign government tax exemption to organizations which were formally separate but closely affiliated with a foreign government. During these early years, the exemption was granted with no distinction between commercial or investment income. In 1920, the Bureau granted the exemption to the Commonwealth Bank of Australia, even though the bank was established as a separate corporation. O.D. 628, 1920–3 C.B. 124, *revoked* I.T. 3789, 1946–1 C.B. 100, *obsolete* Rev.Rul. 69–45, 1969–1 C.B. 313. In that same year, the Bureau declared that a foreign government would not be subject to tax on income derived from the operation of vessels owned by that government through its agents in the United States. O.D. 515, 1920–2 C.B. 96, *obsolete* Rev.Rul. 68–575, 1968–2 C.B. 603. In 1946, the Commissioner of Internal Revenue attempted to withdraw an exemption earlier granted to a corporation owned by the government of Chile that administered development funds for the Chilean government. In one of the few reported court decisions involving former section 892, the United States Tax Court reinstated the exemption. *Vial v. Commissioner of Internal Revenue*, 15 T.C. 403 (1950), *acquiesced* 1952–1 C.B. 4.

Beginning in the 1940's, the Bureau expressed increasing concern about the nature of the organizations receiving the foreign government tax exemption and the types of income qualifying for the exemption. In 1946, the Bureau revoked its earlier position granting an exemption to the Commonwealth Bank of Australia and declared that the exemption could no longer be extended to corporations which were wholly owned by foreign governments "inasmuch as a corporation is an entity separate and distinct from its sole stockholder." I.T. 3789, 1946–1 C.B. 100. Four years later, the Tax Court tempered this principle by limiting its application to a "corporation as that term is understood in the United States." *Vial*, 15 T.C. at 404. In 1952, the Bureau relied on the reasoning in *Vial* to hold that a railway system owned and operated by a foreign government qualified for the exemption because the railway system was "so closely integrated with the executive arm of [the foreign] government as to be a part thereof * * *." I.T. 4082, 1952–1 C.B. 69, *obsolete* Rev.Rul. 70–293, 1970–1 C.B. 282. In distinguishing this case from the situation addressed six years earlier in I.T. 3789, the Bureau explained that the railway system was not a corporation. *Id.* at 71.

In 1966, the Internal Revenue Service ("I.R.S.") stated that its new position, in light of the *Vial* decision, was that an organization separate in form and wholly owned by a foreign government was exempt under section 892 of the Code, provided it did not constitute a corporation as that term was generally understood in the United States. Rev.Rul. 66–73, 1966–1 C.B. 174, *revoked* Rev.Rul. 75–298, 1975–2 C.B. 290. The I.R.S. explained that the label "corporation" referred to an organization whose purposes, functions, and activities customarily were attributable to and carried out by private enterprise for profit in this country. *Id.* .

In 1975, the I.R.S. revoked its previous Revenue Ruling and refined its position once again. The I.R.S. declared that any organization created by a foreign government, which did not engage in commercial activity in the United States on more than a *de minimis* basis, qualified for the tax exemption in section 892, provided the organization met four requirements: (1) it was wholly owned and controlled by a foreign government, (2) its assets and income were derived solely from its activities and investments and from the foreign government, (3) all of its net income was credited either to itself or to the foreign government, and (4) its investments in the United States, if any, included only those which produce passive income. *Rev. Rul.* 75–298, 1975–2 C.B. 290, *clarified,* Rev. Rul. 77–41, 1977–1 C.B. 226.

### D. *Regulatory History*

Despite the long history of the foreign government exemption, no Treasury regulations interpreting former section 892 were promulgated until 1980. In 1980, over sixty years following the passage of the original foreign government exemption legislation, the I.R.S. published Treas.Reg. § 1.892. Among other things, this regulation sought to clarify the types of entities that would fall within the rubric of the term "foreign government" and to limit the corresponding tax exemption to income derived from investment activities, rather than commercial activities.

In accordance with the most recent position of the I.R.S., Treas.Reg. § 1.892 provid-

ed that the foreign government exemption would not be available for income derived from commercial activities. The regulation accomplished this by interpreting the "any other source" language of former section 892 as including only noncommercial or passive investment sources. Thus, subsection (a)(2) and (a)(3) of the regulation provided the following:

(2) *Foreign government exemption.* The income derived by an integral part or controlled entity of a foreign sovereign from investments in the United States in stocks, bonds, or other securities, owned by such integral part or controlled entity, or from interest on deposits in banks of moneys belonging to such integral part or controlled entity, or from any other investment source within the United States, is generally treated as income of a foreign government, which is not included in gross income and is exempt from taxation.

(3) *Foreign government exemption not available.* (i) Income derived by an integral part or controlled entity of a foreign sovereign from commercial activities in the United States is not income of a foreign government for purposes of the exemption from taxation provided in section 892. These amounts are included in income and taxed under appropriate Internal Revenue Code provisions.

(ii) Income derived by an entity created by a foreign sovereign that does not qualify as a controlled entity of the foreign sovereign under paragraph (b)(3) of this section is included in the gross income of the entity and taxed under appropriate Internal Revenue Code provisions.

Treas.Reg. § 1.892–1(b), (c) (1982).

In another subsection of the regulation, Treas.Reg. § 1.892 defined the term "foreign government" for the first time. While acknowledging that the term could include controlled entities of a foreign sovereign, this portion of the regulation also incorporated into the definition of "foreign government" the income source restrictions addressed elsewhere in the regulation:

[A] foreign government consists only of integral parts or controlled entities of a foreign sovereign to the extent not en-

gaged in commercial activities in the United States.

Treas.Reg. § 1.892–1(b)(1) (1982).

In clarifying that the foreign government exemption was available to "controlled entities of a foreign sovereign," Treas.Reg. § 1.892 recognized that the structural form of the entity claiming the exemption was less important than the strength of its attachment to a foreign government. Subsection (b)(3) of the regulation defined "controlled entity" as follows:

An entity which is separate in form from a foreign sovereign or otherwise constitutes a separate juridical entity is a controlled entity if it satisfies the following requirements:

(i) It is wholly owned and controlled by a foreign sovereign directly or indirectly through one or more controlled entities;

(ii) It is organized under the laws of the foreign sovereign by which owned;

(iii) Its net earnings are credited to its own account or to other accounts of the foreign sovereign, with no portion of its income inuring to the benefit of any private person; and

(iv) Its assets vest in the foreign sovereign upon dissolution.

Treas.Reg. § 1.892–1(b)(3) (1982).

E. *The Aftermath*

Prior to 1986, Congress, through former Code section 892, had applied the very same exemption language (*i.e.,* "or from any other source") to both foreign governments and international organizations. In the Tax Reform Act of 1986, directly following the tax years at issue in this case, Congress codified the income source limitations on the foreign government tax exemption that the 1980 Treasury regulations purported to impose. The tax exemption as applied to international organizations, however, remains the same, and now appears in a separate subsection of section 892. As it is currently enacted, section 892 reads:

§ 892. Income of foreign governments and of international organizations

(a) Foreign governments

(1) In general

The income of foreign governments received from—

(A) investments in the United States in—

(i) stocks, bonds, or other domestic securities owned by such foreign governments, or

(ii) financial instruments held in the execution of governmental financial or monetary policy, or

(B) interest on deposits in banks in the United States of moneys belonging to such foreign governments.

shall not be included in gross income and shall be exempt from taxation under this subtitle.

(2) Income received directly or indirectly from commercial activities

(A) In general

Paragraph (1) shall not apply to any income—

(i) derived from the conduct of any commercial activity (whether within or outside the United States),

(ii) received by a controlled commercial entity or received (directly or indirectly) from a controlled commercial entity.

(iii) derived from the disposition of any interest in a controlled commercial entity.

26 U.S.C. § 892(a) (1986).

The exemption language which now applies only to international organizations is exactly the same as the language in the former version of section 892 which applied to *both* foreign governments and international organizations. The portion of section 892 relating to international organizations currently reads:

(b) International organizations

The income of international organizations received from investments in the United States in stocks, bonds, or other domestic securities owned by such international organizations, or from interest on deposits in banks in the United States of moneys belonging to such international organizations, or from any other source within the United States, shall not be included

in gross income and shall be exempt from taxation under this subtitle.

26 U.S.C. § 892(b) (1988). With respect to the income of foreign governments, the 1986 Act deleted the phrase "or from any other source within the United States." *See* 26 U.S.C. § 892(a)(1) (1988). In addition, the present law includes a subsection that specifically denies an exemption to foreign governments for commercial income. 26 U.S.C. § 892(a)(2) (1986). It is for this reason that neither party disputes that under the current version of section 892 the income in question would be taxable.

### Discussion

The plaintiff advances several arguments in support of its position that it is entitled to a refund of the taxes paid on income derived from the leasing of office space in the Post Street building and the rental and sale of the Millbrae houses. The plaintiff's primary argument is that pursuant to former section 892, it was qualified as a foreign government during the tax years at issue and was therefore exempt from taxation on all income earned within the United States, regardless of the source. In this regard, the plaintiff contends that Treas.Reg. § 1.892 was invalid insofar as it limited the applicability of former section 892 of the Internal Revenue Code to income from investment sources. The plaintiff also advances two arguments in the alternative. First, the plaintiff argues that even if the source limitation in Treas. Reg. § 1.892 was valid, the lease income from the Post Street building was still exempt from taxation because the leases were investments in "net leases" rather than commercial activities within the meaning of Treas.Reg. § 1.892. Second, the plaintiff argues that under former section 883 of the Internal Revenue Code, the income derived from the sale and rental of the Millbrae houses was exempt from taxation because this income was incidental to the operation of an international airline.

In contrast to the plaintiff's position, the Government asserts that Qantas did not qualify for the tax exemption under former section 892 because it was not a foreign government. Second, the Government contends that although Qantas may have qualified as a controlled entity within the meaning of Treas.Reg. § 1.892, the income at issue was not exempt from taxation under that regulation because the income was derived from commercial activities instead of investment activities. Third, the Government argues that the rental income and capital gains realized from the Millbrae residences were not exempt from taxation under section 883 because neither category of income was derived from the operation of aircraft.

■ As a threshold matter, this Court must determine whether Qantas qualified as a "foreign government" as that term was used in former section 892. In this Court's opinion filed September 1, 1992, denying the plaintiff's motion for summary judgment, the Court concluded that Qantas did not qualify as a foreign government under the meaning of former section 892 or the regulatory interpretation of the term as expressed in Treas. Reg. § 1.892. Upon further reflection and after additional illumination at trial, this Court now concludes otherwise.

In analyzing this issue, it is helpful to refer once again to the language of the Code provision and the regulations in question. During the tax years at issue (1983–85), section 892 read as follows:

> The income of foreign governments or international organizations received from investments in the United States in stocks, bonds, or other domestic securities, owned by such foreign governments or by international organizations, or from interest on deposits in banks in the United States of moneys belonging to such foreign government or international organizations, *or from any other source within the United States*, shall not be included in gross income and shall be exempt from taxation under this subtitle.

26 U.S.C. § 892 (1982) (emphasis added).

As discussed previously, section 892 did not define the term "foreign government." However, in the early years, the section 892 exemption was routinely extended to entities which were separate and distinct in form, but closely associated with, a foreign government. *See* O.D. 628, 1920–3 C.B. 124 (ex-

emption granted to Commonwealth Bank of Australia even though bank was a separate corporation); *Vial v. Commissioner,* 15 T.C. 403 (1950) (exemption granted to corporation owned by the Chilean government).

The Treasury regulations adopted in 1980 included "controlled entities of a foreign sovereign to the extent not engaged in commercial activities in the United States," within the definition of a "foreign government." Treas.Reg. § 1.892–1(b)(1) (1982). The term "Controlled entity," in turn, was carefully defined as follows:

> (3) *Controlled entity.* An entity which is separate in form from a foreign sovereign or otherwise constitutes a separate juridical entity is a controlled entity if it satisfies the following requirements:
>
> (i) It is wholly owned and controlled by a foreign sovereign directly or indirectly through one or more controlled entities;
>
> (ii) It is organized under the laws of the foreign sovereign by which owned;
>
> (iii) Its net earnings are credited to its own account or to other accounts of the foreign sovereign, with no portion of its income inuring to the benefit of any private person; and
>
> (iv) Its assets vest in the foreign sovereign upon dissolution.

Treas.Reg. § 1.892–1(b)(3) (1982).

The Government concedes that Qantas met the established criteria for a controlled entity of a foreign sovereign. The real contention in this case is the regulatory interpretation of the statutory language of "from any other source" and the resulting distinction between investment income and commercial income in the regulations. The 1980 regulations provided that "controlled entities" would be exempt from taxation on income derived from any "investment source." Treas.Reg. § 1.892–1(a) (1982). However, the regulations expressly denied the exemption for income derived from "commercial activities." *Id.* Under the literal terms of the regulations, then, Qantas did not qualify for the foreign government exemption to the extent that its income was derived from commercial activities.

■ It is the plaintiff's position that Treas. Reg. § 1.892–1 was invalid insofar as it limited the applicability of the former section 892 exemption to income from investment sources only. Plaintiff argues that the plain words of former section 892 exempted income from *any* source, and that the portion of the regulations that purported to reduce the scope of an exemption plainly provided by statute were necessarily invalid. Upon a studied review of the legislative history before, during, and to some measure after the tax years at issue, this Court is constrained to conclude that the plaintiff is correct. Therefore, it is unnecessary to address the plaintiff's alternative theories of recovery, and the remainder of this opinion will be devoted to discussing the statutory foreign government exemption and the subsequent Treasury regulations.

■ As a general matter, Treasury regulations are entitled to considerable deference and are considered valid if they " 'implement the congressional mandate in some reasonable manner.' " *Rowan Cos. v. United States,* 452 U.S. 247, 252, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (quoting *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967)). This general principle, however, merely sets the framework for judicial analysis; it does not displace it. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). As an interpretative regulation promulgated by the Treasury Department pursuant to its general rulemaking powers under 26 U.S.C. § 7805, Treas.Reg. § 1.892 is entitled to less deference than those regulations issued under a specific grant of authority. *See Rowan,* 452 U.S. at 253, 101 S.Ct. at 2292; *Vogel,* 455 U.S. at 24, 102 S.Ct. at 827. Interpretative regulations are reasonable if they harmonize with the statutory origin and purpose. *Vogel,* 455 U.S. at 26, 102 S.Ct. at 828; *National Muffler Dealers Ass'n. Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). Although such a regulation is not invalid merely because the corresponding statutory language will support a contrary interpretation, the regulation in question must be struck down if it is fundamentally at odds with the manifest congressional design.

*National Muffler Dealers Ass'n. Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519. Moreover, as is the case here, "if the regulation dates from a later period [than the statute], the manner in which it evolved merits inquiry." *Id.*

As will be recalled, the original tax exemption provided to foreign governments by section 30 of the War Revenue Act of 1917 was a relatively limited piece of legislation that only provided an exemption for certain types of specified investment income. *See* War Revenue Act of 1917, § 30, ch. 63, 40 Stat. 300, 337 (1917). Soon thereafter, however, Congress passed the Revenue Act of 1918, which provided that gross income would not include the income of foreign governments received from the various types of investment income previously listed in the War Revenue Act, "*or from any other source within the United States.*" Revenue Act of 1918, § 213(b)(5), ch. 18, 40 Stat. 1057, 1065–66 (1919) (emphasis added). Language nearly identical to that used in section 213(b)(5) of the Revenue Act of 1918 appeared in each successive revenue act and eventually became section 892 of the Internal Revenue Code of 1954—the statute in effect during the tax years at issue in this case. The addition of the words "or from any other source" in the 1918 Act, however, created an ambiguity that did not exist in the previous revenue acts. By the addition of these words, the question became: Did Congress intend to exempt only *sui generis* types of investment income of foreign governments, or did it instead intend to exempt investment income *and also* all other types of domestic income (*i.e.,* commercial income)? As with any case involving statutory interpretation, "we state once again the obvious when we note that, in determining the scope of a statute, one is to first look at its language." *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1982) (citing *Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 103 S.Ct. 986, 74 L.Ed.2d 845 (1982)). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). While legislative history cannot prevail over the plain meaning of a statute, if the meaning is indeed plain, courts have often held that even in the face of *apparently* unambiguous language, reference is made to the legislative history to assure that no term was used other than for its ordinary meaning. *Decosta v. United States,* 987 F.2d 1556, 1558 n. 3 (Fed.Cir. 1993) (citing *Glaxo Operations UK Ltd. v. Quigg,* 894 F.2d 392, 395 (Fed.Cir.1990)) (stating that the court should resort to legislative history to determine whether there is a clearly expressed legislative intention to the contrary to the statutory language).

In this case, an examination of the legislative history relating to section 213(b) of the Revenue Act of 1918 is particularly helpful in determining Congress' intent in adding the language "from any other source." *Vogel,* 455 U.S. at 25–26, 102 S.Ct. at 827–28. The House of Representatives Committee Report relating to section 213(b) of the Revenue Act of 1918 provides the following insight:

> Under present law it is not necessary to include in gross income the income of foreign governments received from investments in the United States in stocks, bonds, or other domestic securities owned by such foreign governments, or from interests on deposits in banks of the United States of moneys belonging to such foreign governments. *The proposed bill, in addition to providing that the aforementioned income shall not be included in gross income, provides that income of foreign governments from any other source within the United States shall not be so included.*

H.R.Rep. No. 767, 65th Cong., 2d Sess. (1918), *reprinted* 1939–1 C.B. 86, 92 (Pt. 2) (emphasis added). This language provides strong support for the plaintiff's argument that in adding the "from any other source" language in the Revenue Act of 1918, Congress intended not just to broaden the foreign government exemption to income from any other *investment* source, but rather to extend to foreign governments a blanket tax exemption of income from *any domestic source,* investment or otherwise.

Still more support for the plaintiff's position can be found in the legislative history

relating to section 895 of the Internal Revenue Code, a provision added to the Code in 1961 which addressed the taxation of income earned by foreign banks. The Finance Committee report on the Senate bill, which introduced section 895, discussed the state of the then present law with respect to the taxation of income earned by foreign entities:

> Under present law (sec. 881 of the Internal Revenue Code) foreign corporations not engaged in a trade or business in the United States generally are subject to flat 30–percent tax (collected by withholding at the source) from amounts received on sources within the United States in the form of interest, dividends, rents, salaries, and other fixed or determinable amounts. * * *

> [An] exception to the general rule described above exists in the case of foreign governments and international organizations of which the United States is a member. Present law (sec. 892) provides that these governments or organizations are *completely exempt from tax* in the case of income earned from sources within the United States.

S.Rep. No. 163, 87th Cong., 1st Sess. (1961), 1961–2 C.B. 351 (emphasis added). Especially notable in this description of former section 892 is the use of the phrase "completely exempt" and the lack of any reference at all to a restriction on the source of domestic income which qualified for the 892 exemption. While this statement of subsequent legislative intent is not dispositive, it indicates that forty-three years after the addition of the "from any other source" language in 1918, Congress still understood section 892 to exempt from taxation *all* of the domestic income of foreign governments regardless of the source.

The legislative history of the Tax Reform Act of 1986 reveals additional clues about the way Congress viewed the former foreign government tax exemption. As previously mentioned, prior to the passage of the Tax Reform Act of 1986, the limitations placed on foreign governments and international organizations were the same. The Tax Reform Act of 1986 went into effect after the tax years at issue, and placed upon foreign governments the income source restrictions that the 1980 regulations purported to impose. The income tax exemption for international organizations, however, was placed in a separate subsection of section 892. The exemption language which now applies only to international organizations is identical to the exemption language which formerly applied to both foreign governments and international organizations:

> The income of international organizations received from investments in the United States in stocks, bonds, or other domestic securities owned by such international organizations, or from interest on deposits in banks in the United States of moneys belonging to such international organizations, or from any other source within the United States, shall not be included in gross income and shall be exempt from taxation under this subtitle.

26 U.S.C. § 892(b) (1988). The House Conference Report on the new section 892 legislation explains that under the law as it existed prior to the Tax Reform Act of 1986, "[c]ertain international organizations * * * are completely exempt from tax," and that the 1986 law regarding international organizations "makes no change to present law." H.R.Conf.Rep. No. 99–841, 99th Cong., 2d Sess. (1986), 1986 U.S.C.C.A.N. 4075, 4742, 4743. It is telling that when Congress intended to maintain a complete exemption from taxation for international organizations, it chose to retain the same "from any other source" language that had previously been used in former section 892 to exempt the income of both foreign governments and international organizations. By keeping the "from any other source" language in the context of international organizations, where it intended to grant an unqualified exemption, and deleting the phrase in the context of foreign governments, where it intended to limit the exemption, Congress effectively reaffirmed the significance of the phrase.

Despite the apparent discrepancies between the intent of Congress as expressed in the legislative histories and the limitations on the foreign government exemption imposed by the 1980 regulations, the Government contends that the subsequent enactment of three

major revenue acts after the issuance of the 1980 regulations demonstrates congressional approval of those regulations.[2] It is true, as the Government argues, that in the past, Congress at times has manifested its disapproval of Treasury regulations by amending the Internal Revenue Code to correct the misguided interpretations. However, in attempting to derive the intent of congressional inaction, it is appropriate to consider the degree of scrutiny that Congress devoted to the regulation during subsequent re-enactments of the statute. *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). In this case, there is no evidence that Congress devoted any attention at all to the foreign government exemption in former section 892 when it re-enacted the Internal Revenue Code in 1981, 1982, and 1984. Moreover, when Congress *did* scrutinize section 892 in 1986, it clearly expressed its interpretation of the then current meaning of section 892—an interpretation squarely at odds with the interpretation the defendant advances. As such, it is inappropriate to place more weight on Congress' inaction with respect to former section 892 than the situation warrants.

The Government also takes the position that the legislative history of the Tax Reform Act of 1986 demonstrates congressional approval of Treas.Reg. § 1.892–1 (1982). To reiterate, the Tax Reform Act of 1986 amended section 892 by incorporating into the statute the distinction between investment and commercial income that Treas.Reg. § 1.892 purported to impose. To fully analyze the Government's argument, it is necessary to review the applicable legislative history. The Senate Report contains the following description of the law as it existed prior to the passage of the amendment:

> The income of foreign governments or international organizations received from investments in the United States in stocks, bonds, or other domestic securities, owned by such foreign governments or international organizations, or from interest on

deposits in banks in the United States of money belonging to such foreign governments or international organizations, or from any other source within the United States, is not included in gross income and is exempt from U.S. income taxation (sec. 892). Regulations make clear that this exemption does not apply to any income from commercial activities in the United States (Reg. sec. 1.892–1(a)(3)). That is, the exemption extends only to investment income.

S.Rep. No. 313, 99th Cong., 2d Sess., 1986–3 C.B. 415. Another reference to the state of the law as it existed prior to the passage of the Tax Reform Act of 1986 appears in the House Conference Report, which provides in pertinent part:

> Foreign governments are not subject to U.S. tax on income from their investments in the United States. Treasury regulations specify that income from commercial activities is not investment income and therefore is not exempt from U.S. tax.

H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4742. This Court is unable to conclude from the language of these two excerpts that Congress approved of and endorsed the interpretation of former section 892 that appeared in the 1980 Treasury regulations. Instead, the quoted language serves as little more than an acknowledgement by Congress of the existence of the Treasury regulations in question. This is especially true when one considers that in this same piece of legislation, Congress retained the "from any other source" language of the former section 892 when it wished to continue to provide an unqualified exemption for international organizations. That Congress saw fit to codify the portion of the regulation that limited the exemption of foreign governments to income earned from investment activity suggests that, although Congress agreed that such a change was desirable, it viewed the regulation as legislative in character and inconsistent with the existing law.

---

**2.** Following the issuance of Treas.Reg. § 1.892 in 1980, Congress passed the Economic Recovery Tax Act of 1981 (ERTA), Pub.L. No. 97–34, 95 Stat. 172; the Tax Equity and Fiscal Responsibil-

ity Act of 1982 (TEFRA), Pub.L. No. 97–248, 96 Stat. 324, and the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494.

The Government also argues that Treas. Reg. § 1.892 was faithful to Congress' intent to deny sovereign immunity claims with respect to commercial activities. This argument is based on the restrictive theory of sovereign immunity which the United States Department of State adopted in 1952.[3] The theory was eventually affirmed by Congress with the Foreign Sovereign Immunities Act of 1976. 28 U.S.C. §§ 1602–11 (1976). Under this theory, "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 487, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). Thus, the Government argues that at the time Treas.Reg. § 1.892 became effective, July 22, 1980, the United States did not recognize sovereign immunity with respect to commercial activities.

The problem with the Government's argument is that the plaintiff's claimed exemption from taxation does not rest on a theory of sovereign immunity; it is based upon a specific provision of the Internal Revenue Code that was in place during the tax years at issue. Although the Treasury regulations promulgated in 1980 might have been more consistent with this country's foreign policy position as codified by Congress in the Foreign Sovereign Immunities Act, the intent of Congress regarding matters of taxation as expressed in former Code section 892 remained on the books. The passage of the Foreign Sovereign Immunities Act in 1976 did not "trump" those sections of the Internal Revenue Code which, on a policy level, might have been somewhat inconsistent with the general scheme of sovereign immunity. If Congress wanted to revise the law regarding the taxation of foreign governments to coincide with the new restrictive theory of sovereign immunity, it was up to Congress to do that. As discussed, in 1986, Congress did exactly that. However, prior to 1986, the state of the law, as expressed in former Code section 892, was that the income of foreign governments derived from *all* sources within

the United States was completely exempt from taxation.

The issue in this case is not whether it would have been more desirable, prior to 1986, to tax the corporate income of foreign governments derived from sources within the United States in the same manner that the United States taxes the income of its own domestic corporations. Few would argue that this would not have been more fair. The issue, instead, however, is whether Treas.Reg. § 1.892, was consistent with the plain language, origin, and purpose of former Code section 892. This Court believes that it was not. It is true that Congress ultimately decided in 1986 to codify the portions of Treas.Reg. § 1.892 that excepted from the foreign government exemption income derived from commercial sources. The power to legislate, however, is the sole province of the Congress. The power of the Treasury to administer a federal statute and to prescribe rules and regulations is not the power to legislate, but rather the power to adopt regulations to carry into effect the will of Congress as expressed by statute. *Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936). "A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Id.*

In sum, this Court believes that, as evidenced by the legislative history pertaining to the taxation of foreign entities before, during, and after the tax years in question, the 1918 Congress intended and subsequent bodies of Congress understood former section 892 to exempt from taxation *all* of the income earned by foreign governments within the United States, from whatever source. It is hornbook law that the Treasury has no power to promulgate a regulation which either adds an exception to or supplies an omission in a statute which it believes Congress should have included but did not. *Commissioner v. Acker,* 361 U.S. 87, 91–92, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959). As such, the portions of Treas.Reg. § 1.892

---

**3.** This was accomplished by letter dated May 19, 1952, from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman, which is reprinted in 26 Dept. of State Bull. 984–85, and in *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976) (Appendix 2 to opinion of Justice White).

which restricted the tax exemption of foreign governments to income from investment sources were not sustainable as a valid interpretation of the statutory language in effect during the years at issue in this case.

## CONCLUSION

For all the reasons stated above, the plaintiff prevails in this action and is entitled to a refund of the amount paid pursuant to the dispute herein. In the event the parties are unable to stipulate as to the exact amount of the refund due the plaintiff within 30 days, further proceedings will be scheduled.

Each party will bear its own costs.